683 A.2d 1133

Stephen TEDESCO

v.

Nancy TEDESCO.

No. 288, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Oct. 30, 1996.

650

William M. Ferris (Krause & Ferris, on the brief), Annapolis, for appellant.

Lindsay M. Barranco (Paula J. Peters and Hyatt, Peters & Weber, P.A., on the brief), Annapolis, for appellee.

Argued before CATHELL and HARRELL, JJ., and THEODORE G. BLOOM, Judge of the Court of Appeals (retired), Specially Assigned.

CATHELL, Judge.

The parties' marital union was ended by a Judgment of Divorce entered in the Circuit Court for Anne Arundel County. Appellant, Stephen Tedesco, appeals from that part of the court's order granting custody of two minor children, Bailey Farnham and Brent Tedesco, to appellee, Nancy Tedesco,[1] and ordering the imposition of a constructive trust upon certain property owned by the parties during the marriage. Appellant alleges, *inter alia*, that exceptional circumstances exist sufficient to justify granting custody of the two children to him. He also claims that the trial court erred in finding that he had abused a confidential relationship with his former wife and, thereafter, in failing to undertake the three-step inquiry necessary to resolving contested property matters in divorce proceedings, as set forth in the Family Law Article (FL) of the Maryland Code (1984, 1991 Repl.Vol., 1995 Supp.). He raises the following questions on appeal:

1. Where two spouses have, in all respects, acted as a minor child's parents virtually from the child's birth, but where only one is the child's biological parent, is the fact that only one spouse is a biological parent so determinative of the issue of custody of that child that the biological parent is the only "rational" candidate for custody?

---

1. Appellee was granted a name change to reflect her former married name of Nancy Lowell Farnham. She, however, continues to plead as Nancy Tedesco.

2.  Where one child in a family unit is the biological child of only one of the spouses and the only other child in the household is biologically the child of both spouses, may a trial court treat biological parenthood as a virtually absolute reason for deciding custody of the first child, and then ignore the biological parentage of the second child and treat that child's half-sister as a "sibling" for purposes of applying the presumption against dividing custody of siblings?

3.  May a trial judge properly exclude testimony by a child's teacher as to the likely effect on the child if the child's relationship with the person she has long regarded as her father were to be terminated?

4.  May a trial court use the device of a constructive trust to avoid the application of the Maryland Marital Property Act to a family home, titled to the parties to a divorce as tenants by the entirety, that was acquired in part with funds that were the parties' marital property, and/or to avoid the prohibition in that Act on the court transferring title to stock from one spouse to the other?

5.  Where one spouse owned a business before the parties' marriage, both spouses have worked extensively in it during their marriage, and the spouse who did not have prior ownership did so for little or no salary during the marriage, may a trial judge treat the business as entirely non-marital?

6.  In a suit for an absolute divorce, may a trial court decline to grant a monetary award without following the three-step analysis mandated by the Maryland Marital Property Act?

## THE PRELIMINARY FACTS

In 1989, while appellee was eight months pregnant with Bailey, she and her first husband, Carl Farnham, Bailey's biological father, were involved in a serious car accident. Carl Farnham was killed, and appellee sustained numerous injuries. Six weeks later, on November 13, 1989, Bailey was born. Shortly thereafter, the parties to the instant action began

dating, and, on March 3, 1991, they married. Their child, Brent, was born on January 31, 1992. While the parties were married, appellant began working at Lallie, Inc., a printing firm that appellee had established prior to her first marriage. Appellant acquired increasingly important duties over time to the point that he handled much of the business affairs; appellee continued to focus upon the creative aspects of the company.

In March of 1992, appellee transferred title to a home she had owned since 1983 to herself and appellant as tenants by the entirety. She also transferred five hundred shares of stock in the printing company, half of the outstanding shares available, to appellant.

Several months later, the parties separated, and, on June 11, 1993, appellee filed a Complaint for Limited Divorce, Immediate Custody and Use and Possession and Other Relief. In an Opinion and Order dated September 28, 1993, the trial court found that the parties' relationship had not been characterized by physical violence or allegations of unfitness. The court also believed that appellee should have custody of the children at the family home. Thus, the court granted appellee use and possession of the family home and sole custody of Bailey. Joint custody of Brent was awarded, and a visitation schedule was established. Thereafter, on October 24, 1994, appellee filed a Complaint for Absolute Divorce. In it, she alleged, *inter alia*, that the parties operated within a confidential relationship and that appellant had abused that relationship in obtaining an interest in her assets. She also sought sole permanent custody of Brent.

Following a four-day trial on the merits of appellee's Complaint, the trial court, on July 3, 1995, rendered an opinion from the bench granting the divorce and awarding custody of both children to appellee. The court also found that appellant had exerted undue influence upon appellee and imposed a constructive trust upon appellant's ownership interest in the home and the printing company. Appellant's Motion to Alter or Amend was denied, and, on November 14, 1995, the Judg-

ment of Absolute Divorce became final. Appellant filed a timely appeal therefrom.

## I.

### Custody Issues

Judge Orth summarized the jurisdiction of Maryland courts in respect to child custody cases in *Ross v. Hoffman,* 280 Md. 172, 174–75, 372 A.2d 582 (1977):

> In Maryland, resolving child custody questions is a function of the equity courts ... [which] may direct who shall have the custody of a child.... This jurisdiction is a continuing one, and the court may from time to time set aside or modify its decree or order concerning the child.
>
> In exercising its jurisdiction over the custody of a child, the equity court performs two different but related functions: child protection and private-dispute settlement.... In performing [these functions,] ... the court is governed by what is in the best interests of the particular child and most conducive to his welfare. This best interest standard is firmly entrenched in Maryland and is deemed to be of transcendent importance. [Citations and footnote omitted.]

*See also Montgomery County Dep't of Social Servs. v. Sanders,* 38 Md.App. 406, 417–18, 381 A.2d 1154 (1977); *Mullinix v. Mullinix,* 12 Md.App. 402, 409, 278 A.2d 674 (1971).

■ Within the comprehensive framework of authority governing custody awards, the appellate courts of this State practice a limited review of a trial court's custody determinations. As outlined in *Davis v. Davis,* 280 Md. 119, 125–26, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977),

> [w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of Rule[ ] ... 1086 applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclu-

sion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion. [Footnote omitted.]

*See also Robinson v. Robinson*, 328 Md. 507, 513, 615 A.2d 1190 (1992); *Elza v. Elza*, 300 Md. 51, 55–56, 475 A.2d 1180 (1984); *Hoffman*, 280 Md. at 186, 372 A.2d 582; *Wagner v. Wagner*, 109 Md.App. 1, 40, 674 A.2d 1 (1996); *Burrows v. Sanders*, 99 Md.App. 69, 75–76, 635 A.2d 82 (1994), *cert. denied*, 335 Md. 228, 643 A.2d 383 (1994); *Levitt v. Levitt*, 79 Md.App. 394, 398–400, 556 A.2d 1162, *cert. denied*, 316 Md. 549, 560 A.2d 1118 (1989); *Scott v. Department of Social Servs.*, 76 Md.App. 357, 382–83, 545 A.2d 81, *cert. denied*, 314 Md. 193, 550 A.2d 381 (1988); *Sanders*, 38 Md.App. at 419, 381 A.2d 1154. Indeed, the chancellor's decision is unlikely to be overturned on appeal. *Domingues v. Johnson*, 323 Md. 486, 492 n. 2, 593 A.2d 1133 (1991) ("A chancellor's decision founded upon sound legal principles and based upon factual findings that are not clearly erroneous will not be disturbed in the absence of a showing of a clear abuse of discretion." (citations omitted)); *see also Newkirk v. Newkirk*, 73 Md.App. 588, 591, 535 A.2d 947 (1988) (custody decision is not a matter for the best judgment of the reviewing court). Additionally, the trial court's opportunity to observe the demeanor and credibility of the parties and witnesses is of particular importance. *Petrini v. Petrini*, 336 Md. 453, 470, 648 A.2d 1016 (1994); *see also Wagner*, 109 Md.App. at 40, 674 A.2d 1.

While the right of a natural parent to rear his or her child has been deemed to be "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), and of constitutional dimension, *see Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (natural parents have fundamental liberty interest in the care, custody, and management of their child); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), a court must proceed with singular circumspection and deliberate solicitude in determining to whom the custody of a child

will be awarded. *See Wagner*, 109 Md.App. at 37, 674 A.2d 1. "[T]he well-being of the child, both present and future, is usually profoundly affected by the court's resolution of the private dispute over who shall be entrusted with its care." *Hoffman*, 280 Md. at 174, 372 A.2d 582. This holds true whether the dispute is between the child's two parents or between a parent and a third party. In the case *sub judice*, we have the unique circumstance of considering both situations. We shall address each in turn.

## A.

### Bailey

Maryland courts presume that a child's welfare is "best served in the care and custody of its natural parents rather than a third party." *Newkirk*, 73 Md.App. at 593, 535 A.2d 947. " '[A] court[, however,] has the power, if the best interests of the child require it, to ... commit the custody to a third person.' " *Dietrich v. Anderson*, 185 Md. 103, 118, 43 A.2d 186 (1945) (citation omitted); *see also Kartman v. Kartman*, 163 Md. 19, 22, 161 A. 269 (1932). Indeed, the best interest standard has been espoused by Maryland's appellate courts as *the* dispositive factor upon which to base custody awards. *See Wagner*, 109 Md.App. at 38, 674 A.2d 1 and cases cited therein. As the Court of Appeals noted in *Hoffman*, however, in parent-third party disputes "there is a twist to the application of the best interest standard." 280 Md. at 176, 372 A.2d 582. The Court explained:

Where parents claim the custody of a child, there is a *prima facie* presumption[2] that the child's welfare will be best [ ]served in the care and custody of its parents rather

---

**2.** The rationale underlying this presumption has been thus described:

Normally a parent is to be preferred to others in determining custody, largely because the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display.

*Melton v. Connolly*, 219 Md. 184, 188, 148 A.2d 387 (1959).

than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary. *Id.* at 178, 372 A.2d 582 (quoting *Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463 (1952) (footnote omitted)); *see also Sanders,* 38 Md.App. at 417, 381 A.2d 1154 ("The burden is cast upon those opposing the natural parents to prove that remaining with the biological family would be deleterious to the child's best interest."). The presumption is a rebuttable one and can be overcome by evidence that the parent is unfit to have custody, or that there are such exceptional circumstances making custody detrimental to the best interest of the child. *Hoffman,* 280 Md. at 178–79, 372 A.2d 582; *see also Trenton v. Christ,* 216 Md. 418, 420, 140 A.2d 660 (1958); *Pick,* 199 Md. at 351, 86 A.2d 463. It follows, therefore, that, in parent-third party custody disputes, an inquiry into the best interest of a child will only be conducted when evidence attesting to a parent's lack of fitness or to exceptional circumstances injurious to the child has been presented. *Hoffman,* 280 Md. at 179, 372 A.2d 582.

■ Turning to the case *sub judice,* appellant, as a third party, was required to produce evidence of exceptional circumstances in order to trigger a best interest inquiry.[3] In closing argument, appellant's counsel proffered those facts that he believed exhibited the exceptional circumstances of the case, including the fact that Bailey had been given appellant's surname and had been told that he was her "daddy." He then argued that the relevant case law instructed that, where a child would be detrimentally affected by the termination of the relationship with a nonbiological parent, custody is proper in that parent.

In addressing to whom Bailey's custody would be awarded, the court stated:

As to the most important aspect of this case, the custody question, there is never a clear cut answer in custody cases, but I think this one is perhaps a little more clear cut than

---

3. No allegations of unfitness surfaced.

some. I think certainly ... [appellee] is the natural parent of Ba[i]ley. There is no question that [appellant] has been there since her birth as the psychological father, if you want to call him that. I think he has certainly become involved with Ba[i]ley, and been a part of her life that's been very important. But I don't think there's any ... rational expectation that he could become the sole custodian of Ba[i]ley.

[Appellee] has certainly proven herself to be a good mother, albeit one who has to work. That's part of life today....

....

I think that Dr. [Susan] Toler has indicated that [appellant] should have contact with Ba[i]ley in her best interest, because I think Ba[i]ley has become attached to him, but I think it should be recognized that he is not her biological father, that it is a relationship that should be encouraged, but it should be at a pace that Ba[i]ley sets as she gets older.... [B]ut I think certainly she needs some contact with him at this time to further that relationship that's been going on for five years ... or almost five years.

I think that [appellee] should be the sole custodian of Ba[i]ley, and think that [appellant] should have visitation on one weekend per month at a minimum....

The trial court, thus, was not persuaded that the facts overcame the presumption that custody in the natural parent, *i.e.,* appellee, would best serve Bailey.

◼ Appellant takes great issue with the trial court's statement that it was not "rational" for him to expect to become Bailey's custodial parent and states that the court, in so finding, "departed from the law" and "abused its discretion," necessitating a remand of the case. While he concedes that Maryland courts act upon the presumption that it is in a child's best interest to be placed with a natural parent, he claims that the singular fact that he is not Bailey's biological parent should not mandate that appellee be awarded custody of the child. He states:

In the "unique" circumstances of this case, where [he] acted as Bailey's father throughout her conscious life and is as close to being Bailey's natural father as she can ever have, there is no logical reason to treat him as a "third party" and, thus, no reason why there should be any presumption in favor of [his former wife].

What appellant fails to realize is that the court did not base its decision upon biology alone. It was the lack of persuasive weight of his evidence to demonstrate those exceptional circumstances necessary to rebut the presumption. Moreover, appellant *is*, in fact, a "third party" in relation to Bailey's custody, and he cannot avoid being so characterized merely by virtue of his close relationship with the child. Maryland recognizes a presumption of custody in favor of natural parents over *all* third parties. While appellant seems to urge us to hold that his relationship with Bailey provides an advantage over those third parties not similarly situated, we shall not so hold. There is no distinction in the law among those who are considered "third parties" for custody purposes, and we shall not create such a distinction. Third parties must prove that a natural parent is unfit to care for the child or demonstrate exceptional circumstances sufficient to rebut the presumption before a court will even begin to undertake a best interest analysis.

This does not mean, however, that a natural parent will always be awarded custody of a child over a third party, and past cases have proven that third parties have, in fact, been granted custody when circumstances warranted such awards. *See, e.g., Pick,* 199 Md. at 351–52, 86 A.2d 463 (Court of Appeals reversed award of custody to natural mother of eleven-year-old who had resided with third party for ten years after mother abandoned child); *Dietrich,* 185 Md. at 116, 43 A.2d 186 (custody to foster parents upheld upon father's concession of his inability to raise and care for child at time of his or her birth and left child in care of foster couple for five years); *Boothe v. Boothe,* 56 Md.App. 1, 6–7, 466 A.2d 58 (1983) (grandparents awarded custody over natural mother when custodial father was killed). What it does mean, as we

have indicated, is that those third parties must adduce evidence that demonstrates that the child will be affected detrimentally by an award of custody to the natural parent and the relationship between the child and the third party may be introduced as a consideration.

Consequently, while there may be "[n]o *logical* reason to treat [appellant] as a 'third party'" (emphasis added) in determining custody of Bailey, there is clearly no *legal* reason why he should not be treated thusly. Appellee is Bailey's only living natural or legal parent. Although plans were underway for appellant to adopt Bailey, those plans were never finalized, and the law does not acknowledge the rights of parents other than those who obtain that status by adoption or by nature.

We find support for our position in *Lipiano v. Lipiano,* 89 Md.App. 571, 598 A.2d 854 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 710 (1992), a case bearing close factual similarity to the case *sub judice.* There, this Court upheld the trial court's finding that sufficient exceptional circumstances had not been proven to rebut the presumption in favor of the natural parents. The facts revealed that the child's mother had become pregnant as the result of an extramarital affair. The mother remained married following revelation of the affair and birth of the child; the biological father had no contact with, and provided no support for, the child. When the child was three, the mother and biological father absconded with her, but later returned to Maryland, whereupon the mother counterclaimed for custody of her daughter in response to her husband's complaint for divorce and custody. Although the trial court found that the child's interests were presumed to be best served in the custody of her natural parents, the court found that the mother's husband could prevail in the proceeding upon a showing that the mother was unfit or that exceptional circumstances existed such that custody in the natural parents would be detrimental to the child. It went on to state that the husband had failed to make either showing and awarded custody to the child's natural parents, with visitation to the husband.

On appeal to this Court, the husband asserted, *inter alia,* that he should not have been deemed an "inferior candidate for custody," 89 Md.App. at 575, 598 A.2d 854, simply because he was not the child's biological father, in effect proffering an argument that equitable parents should be considered on equal footing with biological, or natural, parents. Following clarification of the appropriate standard of review, we stated:

> The language used by the [*Hoffman* ] Court is clear and precise. It does not envisage there being degrees of third parties.... Certainly, the closeness of the relationship between the child and the non-biological parent is of considerable importance, but that importance relates to whether there are exceptional circumstances which would make an award of custody to the biological parent detrimental to the best interest of the child. *It does not ... elevate the third party to initial parity with the biological parent....* [The husband] must, to the trial court's satisfaction, overcome the presumption....

*Id.* at 577–78, 598 A.2d 854 (emphasis added). *Lipiano,* therefore, provides appellant with no solace. Moreover, contrary to his assertions, in that case we did not state that the existence of a close and loving relationship between the child and the third party will be "sufficient to justify an award of custody to the third party." Rather, we were saying, among other things, that, in attempting to rebut the presumption, the third party may present evidence of the relationship with the child in demonstrating that custody with the natural parent would be detrimental to the child. A close relationship itself does not, however, create in the third party an advantage over other third parties or over the natural parent. Appellant's argument that his relationship with Bailey should, in some way, negate the presumption in favor of appellee altogether and place them on equal footing in resolving Bailey's custody fails.

For all his arguments as to the exceptional circumstances extant in the case *sub judice,* the record fails to demonstrate that quantum of evidence necessary to hold that the trial court erred in its decision that an award of Bailey's custody to

appellee was proper. We, thus, shall affirm its order as to that child. We further explain.

Appellant relies upon several cases in support of his position, one being *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 640 A.2d 1085 (1994). That case, however, is inapposite and does not "provide [the] guidance" appellant ascribes to it. The case involved an independent adoption proceeding and the termination of the rights of a natural parent contesting the adoption. The case *sub judice* is not an adoption case. Furthermore, although an adoption case does involve an inquiry into the best interest of the child, as the Court of Appeals pointed out, it "carries with it a finality not present in a custody decision." 334 Md. at 560, 640 A.2d 1085. Appellant also gleans from the Court of Appeals's language a "limitation[ ]" upon the presumption. The Court stated:

> We have recognized that in a custody dispute between a natural parent and a third party there exists a general presumption that the child's interests are best served by granting custody to the natural parent. . . .
>
> . . . .
>
> But we have also made clear that the controlling factor, or guiding principle, in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interests of the child.

*Id.* at 560–61, 640 A.2d 1085. This statement, however, does not reflect a limitation upon the presumption, but rather an acknowledgement that the natural parents' rights are not absolute and must be tempered by the best interest of the child—whether that be placement with a natural parent or a third party.

■ Appellant also avers that, because "there is absolutely no indication that the trial judge considered any of th[e] factors" listed in *Sanders*, 38 Md.App. 406, 381 A.2d 1154 *supra*, the trial court abused its discretion in awarding custody of Bailey to appellee. The short answer to this claim is that the court found that that presumption had not been overcome. Appellant had not met his burden of producing

evidence sufficient to rebut the presumption that Bailey's welfare would be best served by an award of custody to her natural mother. The court, therefore, need not detail its findings as to the *Sanders* criteria. We perceive no error in the court's award of custody of Bailey to appellee and shall affirm.

## B.

### Brent

▮ In addressing Brent's custody, the trial court stated:

As to Brent, I think that there certainly ... that's a different situation. Both parties are the natural parents. Both have an interest in seeing him develop and grow into maturity in a good way. I think he needs contact with both his parents, but I don't think in view of the history of this case and the constant conflict and lack of communication between the parties that joint custody would be appropriate. And I don't think that it would be in either child's best interest to have one child in one household and the other in the other, because I do think they respond well as siblings.

So I think sole custody of Brent should be with [appellee] with a much wider visitation schedule for Brent with his father.

Appellant claims that, by its award, the trial court, in awarding custody of Brent to appellee, "created a ... paradox;" that is, the court

treat[ed] biological parenthood as far more important than any other aspect of being a parent, including psychological or emotional parenthood ... [and], having created that situation by focusing so singularly on biological, versus psychological relationships, ... then apparently chose to mitigate that approach by preserving the psychological relationship between Brent and Bailey through placing both of them in the Appellee's custody. In so doing, the trial court abused its discretion.

First of all, as we have stated, the trial court's award of custody of Bailey was based upon a failure of evidence on appellant's part to demonstrate that an award of custody to appellee would be detrimental to the child or that exceptional circumstances existed. Having failed below to rebut the presumption, and failing to demonstrate on appeal that the trial court erred in not finding exceptional circumstances, appellant cannot now claim that he should be awarded custody of Bailey. Secondly, appellant's status as a third party in reference to Bailey renders untenable his position that the court's apparent focus upon the children's psychological relationship in awarding custody of Brent to appellee represents an inversion of sorts. In *both* custody cases, the best interest of each child was the ultimate factor upon which the awards were based, not appellant's rights, and not appellee's rights. In respect to Bailey, the best interest inquiry rested upon the unrebutted presumption that the welfare of a child is best served in its natural parent's custody. Regarding Brent, the trial court determined that his best interests lay in a continued relationship with his half sister, a relationship that the court believed could not exist as comfortably were custody to have been divided, in light of the acrimonious relationship between the parties.

Mindful of our role as an appellate court in such matters, we note, as the Court of Appeals did in *Davis,* that "an appellate court cannot set aside factual findings unless they are clearly erroneous." 280 Md. at 124, 372 A.2d 231. We may not substitute our judgment for that of the trial court on the findings of fact. We may only determine if those findings were clearly erroneous in light of all the evidence. *Colburn v. Colburn,* 15 Md.App. 503, 513, 292 A.2d 121 (1972). "To rule that a chancellor's findings were clearly erroneous, we must first assume the truth of all the evidence and of all the favorable inferences fairly deducible therefrom tending to support the factual conclusion reached by the chancellor." *McClellan v. McClellan,* 52 Md.App. 525, 530, 451 A.2d 334 (1982), *cert. denied,* 295 Md. 283, 465 A.2d 435, *and cert. denied,* 462 U.S. 1135, 103 S.Ct. 3119, 77 L.Ed.2d 1372 (1983).

The trial court found that appellee was an appropriate custodial parent for Brent. It also found that appellee was a good mother who loved her children and that Bailey and Brent would do well to remain together. Adequate evidence was presented to support these conclusions. Therefore, we shall affirm the court's award of custody of Brent to appellee.

## II.

### Admissibility of Evidence

Appellant avers that the trial court committed reversible error when it did not permit him to present opinion evidence from two of Bailey's school teachers concerning the effect that termination of her relationship with appellant would have upon the child. We perceive no error in the trial court's ruling.

The following discussion ensued when the first of Bailey's teachers was being questioned:

[APPELLANT'S COUNSEL] Q Okay. Based on [your] observations, have you formed an opinion as to whether there would be any [e]ffect on Bailey if her relationship with [appellant] was terminated?

[APPELLEE'S COUNSEL]: Objection.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: ... May I know the basis for that? It seems to me that this is an educator, and who's observed this child ...

THE COURT: She's not a professional in this respect.

[APPELLANT'S COUNSEL]: Okay.

Since the court also sustained an objection to a similar question posed by appellant's counsel to another of Bailey's teachers, it appears that the exclusion of their testimony was based upon their qualifications, or lack thereof.

Appellant states that, in Maryland,

non-expert witnesses may express an opinion where all of the transient conditions the witness observed, and that led to that opinion, cannot be reproduced with such fullness and precision as to permit the fact finder to draw its own

inference, and proving the possible effect on a child of terminating such a relationship presents precisely such a scenario.

While a lay witness may indeed testify and give an opinion on matters as to which he has first-hand knowledge, Lynn McLain, *Maryland Evidence* § 602.1 (1987), the admission of such testimony lies within the sound discretion of the trial court, *Yeagy v. State,* 63 Md.App. 1, 22, 491 A.2d 1199 (1985); *see also Ellsworth v. Sherne Lingerie, Inc.,* 60 Md. App. 104, 118, 481 A.2d 250 (1984), *rev'd on other grounds,* 303 Md. 581, 495 A.2d 348 (1985). The court, in the case at bar, ruled that Bailey's teachers were not qualified to express the opinion appellant's counsel sought. We discern no abuse in the court's exclusion of this testimony.

## III.

### Constructive Trust—Confidential Relationship

The trial judge apparently based his imposition of a constructive trust on his finding that a confidential relationship existed between the parties; that appellant was the dominant party in that relationship; and that appellant had, as the dominant party, abused that relationship. We shall first address the law and then assess the facts in order to determine whether the findings of the trial judge are supported by those facts and permissible inferences to be drawn therefrom.

### A. The Law

Prior to the passage of Article 46 of the Maryland Declaration of Rights, ratified in 1972, there was a presumption that a husband was the dominant party in marital situations and that if the presumption was not rebutted, a confidential relationship was also presumed to exist. Prior to the adoption of that amendment, all a wife had to do was allege a husband's dominance and the existence of a confidential relationship.[4]

---

4. Dominance cannot exist in a vacuum. In order for there to be dominance, there must be subservience. Thus, the prior presumption

Once this allegation was made, the burden of establishing that no confidential relationship existed, *i.e.*, the burden of establishing that he was not the dominant party, immediately shifted to the husband. In other words, initially, the wife, because of the presumption, did not have to produce any evidence of the husband's dominance. *See Gurley v. Gurley,* 245 Md. 393, 226 A.2d 276 (1967). That changed dramatically with the passage of Article 46, the Equal Rights Amendment, which afforded equality of rights to both women and men.

We have stated:

When the voters of Maryland ratified what is now Article 46 of the Declaration of Rights ... *[t]he presumption of dominance in a marriage by a husband was erased,* and the right of the husband to claim alimony was born.

. . . .

Article 46, reduced to a simplistic saw, says that "what is sauce for the goose, is sauce for the gander." The Maryland Equal Rights Amendment is a two-edged sword. . . .

*Hofmann v. Hofmann,* 50 Md.App. 240, 243–44, 437 A.2d 247 (1981) (emphasis added, citations and footnote omitted); *see also Burning Tree Club, Inc. v. Bainum,* 305 Md. 53, 66, 501 A.2d 817 (1985) (stating that "the common law presumption that the husband is the dominant figure in the marriage was invalid") (citing *Bell v. Bell,* 38 Md.App. 10, 379 A.2d 419 (1977)).

Accordingly, in our assessment of the issues presented, the existence of a confidential relationship and the imposition of a constructive trust based upon a finding of a confidential relationship, we must focus on either wife/husband cases subsequent to the passage of the Equal Rights Amendment or

---

that a husband was dominant was, in actuality, a presumption of a husband's dominance and a wife's subservience. When both dominance and subservience exist in a marriage, a confidential relationship results. Accordingly, although some of the earlier cases address only a presumption of a husband's dominance, that presumption was really a presumption that a confidential relationship existed with the husband as the dominant party.

cases prior to the Equal Rights Amendment not involving wife/husband transfers—*i.e.,* relationships in which no presumptions were present. In an old case not involving a transfer of assets between husband and wife but, instead, a transfer of assets between a third party and the husband and wife jointly, the Court required that a confidential relationship be proven, not prescribed merely because the party was a female. In *Linnenkemper v. Kempton,* 58 Md. 159, 166–69 (1882), the Court of Appeals, reversing the trial court's finding of duress and undue influence, stated:

> We have examined th[e] testimony most carefully . . . and are of opinion the alleged duress, or undue influence coercing Mrs. Kempton to execute the mortgage in question, has not been satisfactorily established by the testimony. . . .

> . . . [S]he was a lady of good intelligence, in full possession of her mental facilities. . . . [S]he appeared with her husband before a justice of the peace, and solemnly acknowledged the same to be her act. . . .

> . . . .

> . . . [T]here was no reason why she should hesitate to concur in the arrangement. The promptness with which she . . . execut[ed] the mortgage . . . is a significant fact to show that no coercion or importunity on the part of her husband was necessary.

> . . . [C]oercion and duress was an afterthought. Nothing of that sort was heard of till long after the transaction.

A more recent case involving unrelated parties was *Mosebach v. Jenness,* 224 Md. 395, 168 A.2d 182 (1961). The somewhat egregious facts of that case were that Mosebach, in 1955, developed a spinal condition that resulted in a lack of locomotion. *Id.* at 396, 168 A.2d 182. He obtained the services of a woman, Mrs. Babbel, who later married Mr. Jenness. Mr. Jenness, a real estate salesman, cared for Mosebach's real property holdings. Subsequent hospitalizations of Mosebach left him with little use of his legs, and he was unable to control his bodily functions. Consequently, he depended entirely on Mrs. Babbel for care and on Mr. Jenness

for other services. Just prior to the time when the deeds at issue were executed, Mosebach's condition deteriorated. He began to suffer from a distended abdomen (ultimately, it was determined that he had a ruptured bladder and peritonitis). Jenness refused to let Mosebach go to bed until he executed a deed giving a one-half interest in his farm to Mrs. Babbel. Mosebach executed the deeds while intoxicated and was taken to the hospital only after the deeds were recorded. The trial court found no undue influence or duress and further found that a confidential relation had not been established. The Court of Appeals affirmed the trial court's findings. *Id.* at 395–97, 168 A.2d 182.

It is clear that prior to the adoption of Article 46, in cases not involving presumptions, confidential relationships required sufficient, and sometimes substantial, factual support in the record. After the adoption of Article 46, the fact-finding requirements that had previously existed in most relationships other than those of husband and wife,[5] became a requirement for the marital relationship as well.

We discussed factors relevant to establishing a confidential relationship in *Bell v. Bell,* 38 Md.App. 10, 379 A.2d 419 (1977), *cert. denied,* 282 Md. 729 (1978). In that case, the wife, alleging a confidential relationship between her and her husband, brought suit to cancel a separation agreement executed between her and her husband. The agreement was initially drafted by the wife's attorney and subsequent changes were made by the husband. During a subsequent meeting regarding the agreement, the husband, who was taping the meeting, informed the wife of his knowledge of an adulterous affair the wife was having with a police lieutenant. He then informed her of the changes he had made to the agreement and told her that if she did not sign it, he would reveal the affair to the Internal Affairs Division of the police department and to the newspapers. Whenever she threatened to leave the meeting

---

**5.** There were already, and remain in existence, presumptions in respect to attorney/client trustee/beneficiary, etc., relationships. These types of presumptions are not pertinent to the issues here present.

or stated that she wanted to consult with an attorney, the husband threatened to "start the ball rolling." *Id.* at 12, 379 A.2d 419. Although the wife did not leave or consult with an attorney, she made several protests as to the particulars of the agreement and negotiated several changes. *Id.* at 11–13, 379 A.2d 419.

The trial court refused to find a confidential relationship existed because of the numerous changes negotiated by the wife during the meeting. Addressing whether a confidential relationship existed, we stated:

> In order to establish a confidential relationship one must show that by virtue of the relationship between them, he is justified in assuming the other party will not act in a manner inconsistent with his welfare. Unlike many jurisdictions, Maryland does not presume the existence of a confidential relationship in transactions between husband and wife. *Owings v. Currier*, 186 Md. 590, 47 A.2d 743 (1946). In Maryland there has been a presumption that the husband is the dominant figure in the marriage. In *Manos v. Papachrist*, 199 Md. 257, 262, 86 A.2d 474 (1951), the Court noted:

> > "Ordinarily the relationship of husband and wife is a confidential one. Of course, in any given case it is a question of fact whether the marital relationship is such as to give the husband dominance over his wife or to put him in a position where words of persuasion have undue weight. Generally, however, on account of the natural dominance of the husband over the wife, and the confidence and trust usually incident to their marriage, a court of equity will investigate a gift from a wife to her husband with utmost care, especially where it strips her of all her property; and the burden of proof is on the husband to show that there was no abuse of confidence, but that the gift was fair in all respects, was fully understood, and was not induced by fraud or undue influence."

> We noted the questionable foundation upon which this presumption rests in light of Article 46 of the Maryland Declaration of Rights, better known as the Equal Rights

Amendment, in *Trupp v. Wolff,* 24 Md.App. 588, [616] n. 15, 335 A.2d 171 (1975) *cert. denied,* 275 Md. 757 [(1975)]. Since that decision, the Court of Appeals has held that sex classifications are no longer permissible under the amendment. *Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977). Consequently, the presumption of dominance cannot stand.

When the presumption is disregarded *the question of whether a confidential relationship exists between husband and wife becomes a question of fact.* Among the various factors to be considered in determining whether a confidential relationship exists are the age, mental condition, education, business experience, state of health, and degree of dependence of the spouse in question.

*Id.* at 13–14, 379 A.2d 419 (emphasis added).

We then discussed the particular facts of the parties' relationship. Among the relevant facts were that Mrs. Bell had been born in Europe and moved to this country when a child, had left high school before graduating, was a beautician, and had little business experience. We also discussed that Mr. Bell was an experienced businessman, possessed a real estate license, and was a college graduate. Affirming the trial court decision, we stated:

The chancellor considered these facts, but found that no confidential relationship existed primarily because Mrs. Bell negotiated several changes in the agreement and questioned other provisions, as is clearly shown by the tape recording. He found there was a lack of trust and confidence in the other party necessary to the establishment of a confidential relationship. We are unable to say his decision on this issue was clearly erroneous. Md. Rule 1086.[6]

Absent proof of a confidential relationship between the parties, separation agreements, not disclosing any injustice or inequity on their face, are presumptively valid and the

---

**6.** Any evidence of suspicion on the part of the grantors of any such property would, accordingly, be evidence that the grantor did not, in fact, fully trust the grantee. Such evidence would tend to negate the existence of a confidential relationship.

burden is on the party challenging the agreement to show its execution resulted from coercion, fraud, or mistake. *Id.* at 14, 379 A.2d 419; *see also Eckstein v. Eckstein,* 38 Md.App. 506, 379 A.2d 757 (1978) (finding no presumption of confidential relationship and reversing a trial court's finding of duress).

*McClellan v. McClellan,* 52 Md.App. 525, 451 A.2d 334 (1982), *cert. denied,* 295 Md. 283, 465 A.2d 435 (1983), is factually [7] similar to the case *sub judice,* even though it involved a separation agreement and the trial court, unlike the trial court here, failed to find the existence of a confidential relationship. The facts presented to the trial judge in *McClellan* included:

1) that negotiations for the agreement were conducted between the parties in their own home, 2) that Mrs. McClellan was intelligent and understood that she signed a separation agreement, 3) that she understood that the agreement divided property rights, 4) that she handled family finances, prepared tax returns and knew her husband's financial status, 5) and that she was not subjected to undue duress when she helped prepare and then signed the agreement.

*Id.* at 529, 451 A.2d 334. Mrs. McClellan asserted on appeal that the trial judge erred in finding that she was not dominated by her husband and in " '. . . ignoring the issue of the confidential nature of the relationship.' " *Id.* She argued that the trial judge should have found that her " '. . . husband was clearly the dominant party during the marriage,' " thus placing the burden on him to prove the validity of the separation agreement. *Id.* at 529–30, 451 A.2d 334.

In our opinion, we discussed some of the disparities between the parties. We stated:

Mr. McClellan is a high school graduate; his wife did not attend high school. He worked as a plant manager earning over $39,000.00 per year; she temporarily operated an ice cream business and received minimal income. These facts

---

7. See our discussion of evidentiary facts, *infra,* 678–687.

do not contradict the chancellor's conclusion that Mrs. McClellan is an intelligent person. Likewise, the testimony that the appellee once threatened to have his wife committed does not justify reversing the chancellor's conclusion that Mrs. McClellan was not forced to sign the agreement, especially in light of the appellant's admission that she responded to her husband by telling him, "What I should do is just blow your brains out".

*Id.* at 530, 451 A.2d 334.

We noted that we had discussed the concepts of a confidential relationship in *Bell v. Bell, supra,* and we went on to state in *McClellan* that

[i]n order to establish a confidential relationship, the wife must prove that she justifiably assumed that her husband would only act in a manner consistent with the wife's welfare. Maryland law, especially since the passage of Article 46 of the Maryland Declaration of Rights, also known as the Equal Rights Amendment, does not permit a presumption of such a confidential relationship between spouses.[8] Absent proof of the relationship, a separation agreement is presumed to be valid. *Cronin v. Hebditch,* 195 Md. 607, 74 A.2d 50 (1950).

In the present case, the chancellor did not expressly find the absence of a confidential relationship, but by stating on the record his finding that Mrs. McClellan fully understood her own actions, that she had participated in negotiating the agreement, and was not subservient to her husband, the chancellor found *a fortiori,* that a confidential relationship did not exist.

*Id.* at 531–32, 451 A.2d 334.

Likewise, we described the evidence in *Blum v. Blum,* 59 Md.App. 584, 597, 477 A.2d 289 (1984), that we held was

---

**8.** It would be more accurate to state that the Equal Rights Amendment does not permit a presumption that the husband is the dominant party in a marriage. The result, of course, is the same.

sufficient to support the trial court's finding of a confidential relationship.[9]  We emphasized:

> When a confidential relationship has been shown to exist, however, the burden is upon the dominant party to establish that the agreement was fair in all respects.  There is no presumption that the husband is the dominant partner in the marriage.  Since that presumption does not apply whether there is a confidential relationship becomes a question of fact.

In a classic case illustrating the existence of a confidential relationship, *Hale v. Hale,* 74 Md.App. 555, 539 A.2d 247, *cert. denied,* 313 Md. 30, 542 A.2d 857 (1988), we noted the standard for appellate review of a trial court's finding of the existence of a confidential relationship:

> "[T]he question of whether a confidential relationship exists between husband and wife [is] a question of fact . . ."  The trial court found that Mr. Hale was the dominant party in a confidential relationship with his wife.  In reviewing this, as well as the trial court's other findings, "we must first assume the truth of all the evidence and of all the favorable inferences fairly deducible therefrom tending to support the factual conclusions reached by the [trial judge]."

*Id.* at 564, 539 A.2d 247 (citation omitted, brackets in original).

In *Hale,* we noted these facts in evidence before the trial court:  the parties' ages were not known to the trial court; Mrs. Hale had one year of community college education;  she had limited business experience;  her bookkeeping role at her husband's business was ministerial;  as an officer of her hus-

---

**9.**  We described the evidence of a confidential relationship in *Blum* as including

the regimented shopping expeditions;  the required precise parking of the car;  washing of the car wheels;  budgeting constraints;  lack of flexibility in arranging the food and clothing;  the relative positions of the parties in the marriage;  and Mrs. Blum's concern that he would not let her leave the marriage.  The chancellor also found that the attorney who prepared the agreements sought to represent both Mr. and Mrs. Blum and that Mr. Blum dictated the terms of the agreement to that attorney.

*Blum,* 59 Md.App. at 597, 477 A.2d 289.

band's business, she merely signed whatever papers he told her to sign; when she had business responsibility it so overwhelmed her that she had to move out of the house; she was unable to run the company and a replacement for her had to be hired; she only managed the household according to a budget he provided; she had never had her own bank account; she had guaranteed some of his notes because she had been told by him to do so; she was not well physically at the time the agreement was made; their separation had caused her *great emotional distress;* she had difficulty eating and sleeping; she had developed an ulcer; she had always reposed trust in him to take care of her and their child; he intended for her to trust him; and he used all of the above factors and her trust in him to "extract" the agreement from her. We then affirmed the trial court's finding of a confidential relationship based on Mr. Hale's dominance and Mrs. Hale's subservience. *Id.* at 564–65, 539 A.2d 247.

As to the imposition of a constructive trust based upon the abuse of a confidential relationship, *Wimmer v. Wimmer,* 287 Md. 663, 414 A.2d 1254 (1980), is instructive also. *Wimmer,* a case arising after the adoption of Article 46, illustrates the detailed factual support required for the imposition of a constructive trust in the marital context. In *Wimmer,* the wife sought to impose a constructive trust upon several properties that were titled in the husband's name alone and bought by the husband using his own funds. The Court noted that: 1) the husband was the breadwinner; 2) the wife was the homemaker; 3) the husband "demonstrated unique business acumen"; 4) the wife could hardly read and write and depended upon her husband to explain business and financial matters; and 5) he frequently obtained her signature on business notes. *Id.* at 664, 414 A.2d 1254. Several years after purchasing the marital home, the husband secured a loan by mortgaging the marital home. The wife initially refused to sign the mortgage note, but the husband "twisted her arm and struck her on the back of the neck thereby forcing her to sign same." *Id.* The wife testified that she thought the home was titled in both names, even though it was not, and that the proceeds of the

mortgage she had signed were used by him to buy properties in his name alone. *Id.* at 665, 414 A.2d 1254.

The trial court declined to impose a constructive trust as to any property except the marital home. In support of its imposition of a constructive trust on the marital home, the court "found . . . a confidential relationship . . . and that [the husband] was the dominant party." *Id.* at 665, 414 A.2d 1254. The husband appealed, and we affirmed. The Court of Appeals reversed. At that level, the husband conceded that a confidential relationship existed but argued that it had not been abused. Discussing the trial court's imposition of a constructive trust, the Court stated:

> [The chancellor] found that Cecil [the husband] had failed to meet his burden of proving fairness in the context of a confidential relationship with respect to property in which Annie [the wife] had an interest—that interest being merely what the chancellor termed a "marital interest." It was apparently the chancellor's view that the court could base the imposition of a constructive trust upon a spouse's non-monetary contributions to the marriage.
>
> In determining whether the chancellor was correct in his conclusion, we shall decide whether the facts of this case relating to a mortgage transaction warrant the imposition of a constructive trust and whether the chancellor was correct in basing his decision in part on what he termed Annie's *marital interest* in Cecil's property.

*Id.* at 667–68, 414 A.2d 1254.

The Court then defined the concept of constructive trust:

> A constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property. The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it. The purpose of

the remedy is to prevent the unjust enrichment of the holder of the property.

In the ordinary case, there must be *clear and convincing evidence* not only of wrongdoing, but also of the circumstances which render it inequitable for the holder of the legal title to retain the beneficial interest. *Peninsula Meth. Homes v. Cropper,* 256 Md. 728, 261 A.2d 787 (1970). However, where a confidential relationship exists, the rules are somewhat different. In the context of the law of constructive trusts, a confidential relationship "exists where one party is under the domination of another, or where, under the circumstances, such party is justified in assuming that the other will not act in a manner inconsistent with his or her welfare." *Bass v. Smith,* 189 Md. 461, 469, 56 A.2d 800 (1948). A confidential relationship will not be presumed from a marital relationship, but must be established by convincing evidence. *Fant v. Duffy,* 232 Md. 481, 194 A.2d 293 (1963); *Bell v. Bell,* 38 Md.App. 10, 379 A.2d 419 (1977)....

In those cases in which this Court has approved the imposition of a constructive trust there has been some transaction in which the alleged wrongdoer has acquired property in violation of some agreement or in which another person had some good equitable claim of entitlement to property resulting from the expenditure of funds or other detrimental reliance resulting in unjust enrichment.

*Id.* at 668–69, 414 A.2d 1254 (bold and emphasis added, some citations omitted). After noting that "[o]rdinarily, a constructive trust must be established from circumstances surrounding the inception of the transaction and not from subsequent events," *id.* at 671 n. 3, 414 A.2d 1254, the Court discussed, in the absence of Maryland cases, several foreign cases that had imposed constructive trusts in the marital context.

The Court first looked to *Tomaino v. Tomaino,* 68 App. Div.2d 267, 416 N.Y.S.2d 925 (1979). In *Tomaino,* a husband actively misled his wife, when acquiring the property in his name alone, by telling her that it was unnecessary for her name to be on the property because New York was a commu-

nity property state. Thereafter, he "induced her" to give him money for improvements on the subject property. The Court of Appeals next discussed *Genter v. Genter*, 270 So.2d 388 (Fla.Dist.Ct.App.1972). In *Genter*, the parties borrowed money from the wife's grandmother to purchase the property with the understanding that even though it would be titled in the husband's name, she would have an interest in it. The Court also considered *Cline v. Cline*, 297 N.C. 336, 255 S.E.2d 399 (1979), in which the husband, when he and his wife were buying a farm, persuaded her to sign the mortgage after telling her that the farm would be held jointly and the liability paid off jointly. The husband, nevertheless, took title solely in his own name.

The *Wimmer* Court, after discussing these cases, concluded that the elements of a constructive trust, wrongdoing, property transfer, and unjust enrichment, were not established. The Court added:

> While the imposition of a constructive trust is a remedy which may be applied to correct a broad spectrum of inequitable conduct, it is not however, a remedy for every moral wrong arising in societal affairs. A court of equity will not deprive one person of property titled in his name and give it to another merely because the latter believes herself to be deserving of it.

*Wimmer*, 287 Md. at 674, 414 A.2d 1254.

## B. The Evidentiary Facts

The facts in *Hale, supra,* supporting the dominance/subservience finding, are vastly greater than the facts in the case *sub judice*. We have examined the record here for factual support for the dominance/subservience prerequisites for the trial court's finding of a confidential relationship. It is virtually nonexistent. The facts more readily support a finding of dominance by appellee, not appellant. We shall explain.

When ruling that a constructive trust should be imposed upon the contested property, the trial court stated:

I think [appellant] focused in on [appellee's] company once he met her and decided in his own mind that that was a good place to settle down after their relationship really got going and by the fall of 1990 I think it was clear that that was his desire to get into that business, even though at the time he was still working for [another company]. But I don't think he was making an awful lot of money there, and it was traveling work up and down the Atlantic coast. I think he preferred to settle down in a station[a]ry type job.

I think that, really, the whole course of conduct over that year up to their marriage and immediately following indicates that [appellant] was definitely interested in the monetary aspect of . . . that business and [appellee's] property. And I think it comes out quite clearly that when she got her inheritance early in the marriage, or at least a portion of whatever that distribution was, the twenty seven thousand, within a month or two of the marriage he immediately paid off his own loans that he had brought into the marriage. And I don't think there was really much testimony about that, but it just seems to be part of the pattern of his behavior.

And thereafter he began to get interested in coming in more often. He had been doing things off and on at Lall[ie], but not on a formal basis until after the marriage really got settled. And by the fall, apparently after he was in the business for a while . . . fall of 1990, there were frictions as to whether or not he should become more involved and I think [appellee] saw some problems. He was exerting more and more influence apart from her. She felt it was her company, and, indeed, it was. She had built it to what it was and felt sort of a personal feeling about it. And I think he was infringing on that and pushing a little too hard to try to get into it, and then when he left his own job at [the other company] for whatever reason and came in full time, that just made things go from bad to worse.

. . . .

[A]nd that was having an effect on their marriage, too, because I think as [appellee] testified, she . . . wanted a

marriage but she didn't want a husband in the business with her, and he wasn't going to be replacing Carl [Farnham] in the business for what he was able to do, even though I think he wanted to.

And in February of 1992 he managed to have her ... agree, I guess ... although it's not really clear whether she did much in agreement, but when they got Wayne Kosmerl to draw up these papers and deed over half the house and five hundred shares of Lall[ie], it appears to be to me just to be an effort on her part to placate him and keep him ... happy, so to speak, but not as part of an agreement to actually give him that. He was trying to indicate that that would be a good way to dispose of this property if something happened to them. She trusted him. She felt that she should go along with what he said and I don't think she initiated any of that. In fact, she was opposing it most of the way.

So I think he did exert undue influence on her to get her [to] sign over both her house and the five hundred shares of stock, and I will impose a constructive trust on those two gifts, or whatever you want to call it.

While we would be hard pressed to affirm the trial court's decision based upon its findings—*i.e.*, we are not convinced that its findings are sufficient to support the establishment of a constructive trust—we have examined the evidence and the facts and find virtually no factual support for the trial court's finding regarding the existence of a confidential relationship in the first instance. The trial court's findings are based, it appears, on its unsupported assumptions and improper presumptions. We look to the facts. As we do so, we concentrate primarily on evidence presented either by appellee or by the court's witnesses.[10]

---

10. We do include the uncontradicted evidence of Mr. Curtis, who obtained the Dunn & Bradstreet report on Lallie, Inc., and who testified that it was not only obtained before the marriage, but was also shown to and shared with appellee prior to the marriage. We further acknowledge that because of the order and manner in which witnesses were called, interjected, recalled, etc., we are not entirely certain as to

Initially, both parties at the time of trial were of comparable ages—she was 41 and he was 36. Consequently, there was no issue that she had become enfeebled by age or was too young and immature to understand what was occurring when the interests in the business and home were transferred. Mrs. Tedesco had a Bachelor's degree. Mr. Tedesco had obtained a junior college degree and was some thirty credits short of his Bachelor's degree. There were no educational differences of any significance that would support a finding that he was better educated than she. In fact, she was better educated. Prior to meeting her, he had a successful position as a salesman with IMTRA, earning around $35,000 per year—she was earning considerably more. He had at one time started a successful business, as had she; hers, however, appears to have been much more successful. Thus, with respect to business acumen, both parties were, at a minimum, equally situated. If one was more successful than the other, it was she, not he.

Two professional psychologists testified. It is not at all clear whether they were called by appellant or by the court. The first was Dr. Toler. Her testimony included the following:

> Mrs. Tedesco ... feels ... ill at ease, and uncomfortable over ... a sense of entitlement that Mr. Tedesco seems to have.
>
> . . . .
>
> ... [P]roblems existed almost immediately around the business that was originally developed by Mrs. Tedesco, and Mr. Tedesco's role and responsibilities in the business.
>
> ... But it was her perception that he began to encroach on this business, without ... respecting the origins of the business.
>
> It was his perception that she needed the help. . . .

---

who called which witness. Nevertheless, we have attempted to concentrate on the evidence presented by appellee. When we know otherwise, we shall so indicate.

Dr. Toler performed psychological tests on appellant and opined that he

was a fairly passive person. . . .

. . . But he also tended to be somewhat dependant [sic] in interpersonal relationships. . . .

. . . He may be unassertive and non competitive in relationships. . . . He seems very very sensitive . . . tends to be apprehensive, fears humiliation.

. . . I think he basically tends to depend on other people to help him.

. . . .

. . . [T]here was a fairly strong passive dependent pattern. . . .

As to Mrs. Tedesco, Dr. Toler noted that, "she [at the time of the marriage] was certainly more vulnerable, because of the recent birth and the recent death of her husband."

Dr. Smith, also a licensed psychologist, testified that he had found Mr. Tedesco to be:

[S]omewhat dependent on other people.

. . . [I]n the relationship with Mrs. Tedesco, that Stephen tended to be the passive figure in the relationship, and somewhat dominated by his wife.

. . . .

. . . [H]e appeared to have certain dependent personality traits. . . .

. . . .

[H]e is . . . an easy going, fairly passive individual.

Mrs. Tedesco's brother described her as "a very strong willed individual . . . [but] at the same time she's soft." He noted that when Mrs. Tedesco's first husband died, "that void had to filled . . . and *she put* this person [Mr. Tedesco] in there, and he filled the bill. . . ." (Emphasis added.)

One friend described appellee shortly after her prior husband's death: "[S]he became very determined to . . . appear very strong and . . . as if she was dealing well with the

situation ... but it was almost as if she was avoiding the reality of what had happened to her." This friend of Mrs. Tedesco, called in her behalf, described appellant as "a tremendous help to Nancy."

Perhaps more significant is Mrs. Tedesco's testimony in which she acknowledges certain circumstances surrounding the arrangement that evolved during the period between her first husband's death until the parties' separation. When asked why she had married appellant, she responded: "We had been dating, seriously, living together. He helped me.... He became a part of my life. He took care of my baby, he had interest in my work.... [W]e had many of the same friends.... [H]e had a lot of the things that I was looking for." She testified that his first extensive contact with the business was when she needed help in taking down and bringing back an exhibit she had taken to a trade show in New York. She requested his help: "I asked Steve if the last night of the New York show ... and then he could drive the truck back with me.... [H]e said, yes." At another point, she testified:

I thought it was very important that he come into the business and learn the business the way it was established....

That he learn the way the company was managed and how the company operated, first ... [b]ecause he was in sales ... we had a need for a ... marketing representative.

... [I]t was great to have a male around to help.

Later, when asked again why she had married appellant, she responded:

I thought he loved me. I thought he had all the things I was looking for in a man. I thought he was honest, trustworthy. I thought we had a lot of things in common. He loved my baby. He had interest ... showed interest in the business.

... He ... was very helpful around La[lli]e ... [f]ixing things.

Appellee stressed the fact that appellant had obtained a Dunn & Bradstreet report on her business apparently as evidence of some improper and calculating motive on the part of appellant at the beginning of that relationship. Ed Curtis, the person who obtained the Dunn & Bradstreet report on Lallie, testified that it was obtained for both appellant and appellee before their marriage and shared with Mrs. Tedesco in his presence prior to her marriage to Mr. Tedesco. The following colloquy took place between Mr. Curtis and appellant's counsel:

Q ... Now, did there come a time when you did a D and B on La[lli]e Incorporated?

A Yes.

Q ... First off, why did you do that?

A ... [H]e [Steve] had made comment to Nancy that, he had a friend ... that has access to credit reporting information.... [He said to Curtis] run one on her company, so I did.

. . . .

... [I]t's a business information report. It was not a credit report....

. . . .

... I shared the information with Nancy, the SIC code distinguished her business from other businesses.

. . . .

Q Was this discussion [with Nancy] before or after ... they married?

A Before.

. . . .

I shared with her the details of the report....

. . . .

At that point ... she requested that I ... run D and B's on other competitors of hers.

. . . .

Q And did you in fact do that?

A Yes.

We have been unable to find in the joint record extract where Mr. Curtis's testimony was ever challenged.

Mrs. Tedesco testified at length about the circumstances surrounding the transfer of the property interests to Mr. Tedesco. We include substantial portions of it:

Q ... Could you tell the Court what the discussions were prior to the deed being drawn and the stock being transferred....

A ... [T]he discussion was that, if something were to happen to me, that instead of going into my estate ... the company going into my estate, and getting involved in ... the legal process, that he having the children and working at La[lli]e, could continue working at La[lli]e and support the children, and take care of the house.

....

... And the ghost of Carl was in that house as far as Steve was concerned. And I had felt that I had put Carl behind me and ... to start this marriage and give the best possible for Bailey and myself, and this marriage.

... I'll prove to you that I ... that this is our life. I mean Carl is dead. This is our life, okay. So that was the house.

The stock I still had a hard time with it....

And he again brought the fact that it would keep it out of the legal process, like what I had been through with my husband[']s estate. Carl did not have a will.... I mean it was just awful.... I had a brand new baby ... had to go to orphan[']s court to get guardianship....

... There was land out in [S]teamboat, had Carl's name on it, and that had to be re-deeded ... there was just all kinds of legal stuff that I had never been exposed to.

... [The problems when Carl died] it was a raw nerve ... so I ... thought well, that makes sense ... he [Steve] said to me, look if you're worried about if something happens between you and me, I know this business has been yours for fifteen years, and I trusted him.

Also on direct, she was asked about how she came to convey the stock to him. Her answers included:

I had a trust ... money from the accident and CD money, and stock.

... I wanted to get everything in one place, so I had this trust in Boston. And after we were married he wanted to put his name on my trust.

. . . .

... [W]e were referred to a trust lawyer, and we were in a meeting, discussing the trust.

. . . .

... [T]here were several meetings ... and we were talking about the will too.

... And in one of these meetings ... out of the clear blue, Steve said, Oh, and we want to transfer the stock of the company and change the deed of the house.

And ... I said, what? ... [T]hat was the beginning of it.

She further testified that she still continued to discuss the issue of the stock transfer with appellant. On cross-examination, appellee was asked about the events surrounding the transfer of the stock and responded:

Q ... [I]n so far as probate was concerned, you were in agreement with ... Steve ... that trying to avoid probate was a good idea?

A Yes. But through my lack of understanding or knowledge ... but I also trusted him.

Commenting on appellant's inclusion in the business, she stated:

[A]fter he was fired [from the previous job] he wanted ... to come in the business, full time.... I said, no.

... He tried to tie the business in with the marriage.... [I]f we could be married, we should be able to work together.

And I said, no....

. . . .

And ... *I thought very hard on this*.... Because it was so tied up with the marriage, and at the time I might have been pregnant to[o]. That to save everything, ... I let it happen. [Emphasis added.]

She was cross-examined about certain events occurring after she had requested that he take time off from the business: "[H]e said that he was going to go start his own business. I didn't think that was the greatest idea.... Why have two family owned businesses.... I questioned his ... capability of doing it."

Later, in respect to appellant's involvement in the business, she testified on cross-examination:

[L]ike the business, Mr. Tedesco did not sort of toe the line as the new guy in town.

... [H]e went in and tried to change things, and take over and at the house tried to do the same thing.

... He just started flexing his mussels, [sic] that's all.

There is nothing that we can see in the evidence that indicates that Mrs. Tedesco was not fully aware of what she was doing when she transferred the interest in the company and the house to Mr. Tedesco. It is clear that she had reservations *and was fully aware of those reservations*. The evidence clearly indicates that, if not invited, his initial participation in the company was welcomed.

Moreover, when conflicts arose in the operation of the business, she, not he, prevailed. She directed his exit from the company, and he left. When the conflict in the marriage came to a head, she prevailed in forcing him from the house and from participation in the business in which he was half-owner. There was also testimony, apparently uncontradicted, that she threw things at him and "made fun of [his private] parts." The psychologists testified that he, not she, was the dependent person in the relationship.[11]

---

11. One of them speculated that he might have been "a wolf in sheep's clothing."

There is nothing indicating his dominance over her—nothing establishing the degree of dominance necessary to establish a confidential relationship. The law permits a party to make a bad decision. It permits persons to enter into arrangements to convey property even if they have reservations about it. The mere fact that the parties are married does not permit a party to rescind such an agreement on the grounds of *I wish I hadn't* or *I suspected that I should not have done it, when I was doing it.*

However much a perception might rise in litigation that a party should not have made the bargain that she made, the courts do not have the power to undo those arrangements by utilizing the court's hindsight. What occurred here, the conveyance of property into joint ownership with one's spouse, is common. Questions about such arrangements, we would suspect, are frequently in the minds of grantors of such interests. These questions do not make the arrangements invalid. In the majority of instances, *i.e.,* those in which the marriage is successful, the bargain is generally considered to have been a good one. The subsequent commencement of marital difficulties and breakup of the marriage do not retroactively create a confidential relationship or dominance at the time of the conveyances.

There was insufficient evidence, even considering the standard of review that applies in our examination of what occurred below, to support the findings made and conclusions reached by the trial judge. Those findings themselves, even if supported by sufficient facts, did not support the creation of a constructive trust. The trial court clearly erred. We shall reverse the trial court's order establishing a constructive trust and remand to the court for a full application of the Marital Property Act's provisions to all of the property of the parties.

Finally, the trial court, after imposing the constructive trust, stated:

[T]he rest of the . . . monetary aspects of this case [I] think should fall by the wayside. I think the parties should go where they came from . . . almost like there was an annul-

ment of the financial situation ... forget the rest of the items that were brought up.

Simply stated, a trial judge cannot do that. He *must* conform to the requirements of the Marital Property Act.

**JUDGMENT GRANTING CUSTODY OF THE CHILDREN TO APPELLEE AFFIRMED; JUDGMENT IMPOSING CONSTRUCTIVE TRUST REVERSED; CASE REMANDED TO CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE SHARED EQUALLY BY THE PARTIES.**