741 A.2d 533

**Glenn Ivan ROSENBERG**

v.

**STATE of Maryland.**

**No. 1772, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 3, 1999.

226

228

Bradford C. Peabody, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Steven L. Holcomb, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore; Robert Dean, State's Attorney for Montgomery County, Rockville, on the brief), for appellee.

Submitted before MOYLAN, HOLLANDER and EYLER, JJ.

HOLLANDER, Judge.

Appellant, Glenn Ivan Rosenberg, was convicted by a jury sitting in the Circuit Court for Montgomery County of two counts of theft of property valued at more than $300. He was subsequently sentenced by the court to two consecutive terms

of fifteen years of imprisonment, with five years of each term suspended.[1] On appeal, Rosenberg presents a pentad of issues, which we have rephrased slightly:

I. Did the trial court err in denying appellant's motion to suppress a) physical evidence recovered during a warrantless search of his canvas bag and car, and b) physical evidence recovered from his home pursuant to a search warrant?

II. Did the trial court err in its jury instructions on reasonable doubt?

III. Did the trial court err in admitting evidence of "other bad acts"?

IV. Did the trial court err in permitting a police officer to give lay opinion testimony?

V. Did the trial court err in admitting certain evidence at trial that was provided by the State in violation of the discovery rules?

As we perceive no error, we shall affirm the trial court's judgments.

## SUPPRESSION HEARING

In deciding whether the court erred in denying the suppression motion, the record at the suppression hearing is the exclusive source of facts subject to our review. *Lee v. State,* 311 Md. 642, 648, 537 A.2d 235 (1988); *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987); *Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994), *cert. denied,* 337 Md. 89, 651 A.2d 854 (1995). We extend great deference to the first-level factual findings of the suppression judge and accept the facts as found, unless clearly erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). Moreover, we give due regard to the hearing judge's opportunity to assess the credi-

---

**1.** In his brief, appellant erroneously states that the court imposed concurrent sentences.

bility of the witnesses. *McMillian v. State,* 325 Md. 272, 282, 600 A.2d 430 (1992). Although we review the evidence in the light most favorable to the State as the prevailing party, *Riddick,* 319 Md. at 183, 571 A.2d 1239, we must make our own independent constitutional appraisal. This is accomplished by reviewing the law and applying it to the facts as found by the suppression judge. *Howard v. State,* 112 Md. App. 148, 156, 684 A.2d 491, *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997); *Jones v. State,* 111 Md.App. 456, 465, 681 A.2d 1190 (citing *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)), *cert. denied,* 344 Md. 117, 685 A.2d 451 (1996). With these principles in mind, we turn to review the evidence adduced at the suppression hearing.

At around 10:00 p.m. on October 7, 1997, Montgomery County Police Officers Sean Reilly and Alexander Scott Power arrived at the area of Kersey Road and Monticello Street in Silver Spring, Maryland, in response to a call reporting suspicious activity. The officers, who were in uniform, arrived separately in marked police vehicles. Upon arrival, the officers saw appellant seated on the ground in front of an open telephone equipment box.[2] The box consisted of a double door metal container encased in concrete, which was located between the sidewalk and curb; it was about four feet high, three feet wide, and one foot deep. Inside the box were rows of wires. According to Officer Power, "several wires were pulled out from the box.... [S]everal of them were actually sticking out as if someone had pulled on them." On the ground, a few feet from appellant, were a socket wrench, wire cuttings, and a white canvas bag with some wires and tools sticking out. One of the exposed tools was an orange and yellow hand-held telephone receiver. The officers recognized the tool as one used by telephone repair persons.

When the officers asked appellant what he was doing, he responded that he was "testing out his equipment." Appellant indicated that he did not work for the telephone company.

---

**2.** The telephone equipment box was described as a connection point between the central office and area residences.

When he was asked where he got his tools, he responded that he had bought them. Upon request, appellant produced his driver's license for identification. A warrant check came back "negative." The officers also performed a pat down of appellant and made a cursory look inside the canvas bag for weapons. Although no weapons were discovered, the canvas bag contained several unidentifiable tools and several papers on which were written 1–800 and 1–900 telephone numbers. Officer Power also found a blue technician's repair card dated June 20, 1997.

About five minutes after they arrived, the officers looked through the window of appellant's car, which was parked close by. Inside the car, lying on the back seat, was a "Bell Atlantic" hard hat, like those used by telephone repair persons. When Officer Power saw the helmet, he recalled an earlier report of a break-in involving a Bell Atlantic truck. Appellant told the officers that he received the helmet from a friend.

Appellant was "fidgety" and "very evasive in his movements." Officer Reilly believed that appellant was "tampering with the phone lines." The officers reported the situation over the radio and within a few minutes two other officers appeared on the scene. One was Montgomery County Police Officer Elizabeth Cornett, who heard appellant's name broadcast on the police radio and went to the scene because appellant was "known to have a lot of guns." She was aware that appellant had previously been suspected of using explosives, and she once saw him "scaling the side of a building with gasoline." Moreover, appellant was listed on interdepartmental bulletins for officer safety because of an incident in which he had followed home an officer who had intervened in his harassment and stalking of his ex-wife. Because of other encounters with the police, the bulletins also noted that appellant owned a large number of guns and had a working knowledge of explosives.

About fifteen minutes after Officers Reilly and Power arrived, appellant indicated that he wished to leave the area.

He was told, however, that he could not leave until his car was searched. Appellant then gave the police permission to search his car, saying: "You can go and search it." Inside the trunk of appellant's car the police discovered two small medicine bottles labeled "mercury." Knowing that mercury can be used to make explosives, two bomb sniffing K–9 units and a fire marshall were called to the scene. Also in the trunk of the car were several more papers on which were written 1–800 and 1–900 telephone numbers. At this time, the officers performed a second search of the canvas bag to determine if there were any markings on the items identifying them as property belonging to Bell Atlantic. The items contained no such markings.

Around this time, Sergeant Alan Goldberg arrived at the scene. After being briefed by the other officers, recognizing the specialized nature of the tools, and recalling an earlier report of a break-in of a telephone company truck, the sergeant contacted a Bell Atlantic representative and Detective Robert Angelino, a member of the Montgomery County Police Department's Special Investigations, Electronic/Technical Support Unit, to come to the scene. Based on what he saw, Detective Angelino said: "I thought we had a theft of ... service [from the telephone company]. I thought we had a possible theft of equipment." He based his view of possible theft of services on the open telephone equipment box, the condition of the wires, and a butt-in set.[3] Sometime between an hour and an hour and a half after the first officers arrived at the scene, Sergeant Goldberg decided to arrest appellant "at the minimum for destruction of property [and] vandalism for tampering with the box." Appellant was handcuffed and transported to a police station for questioning.

After appellant was taken to the police station, the Bell Atlantic representative and Detective Robert Angelino arrived at the scene. The telephone company representative thought the canvas bag contained Bell Atlantic equipment. Although

---

3. A "butt-in set" refers to a tool used to monitor or eavesdrop on existing telephone calls or to make calls.

the Bell Atlantic representative recognized many of the tools as the type used by the company, she was unable to "positively" identify any of the items contained in the canvas bag as belonging to the company.

Detective Angelino searched the canvas bag and recognized many of the tools as those used by telephone repair persons. He also believed that the items were not generally available to the public. When Detective Angelino inspected the telephone box, he noticed that some wires had been pulled out. The wires showed evidence of "crimping," a term referring to indentations on the wires from the use of certain equipment. The marks on the wires were consistent with someone attaching a "butt-in set" with "alligator clips," so as to allow the user to make a telephone call.

The Bell Atlantic representative, Sergeant Goldberg, and Detective Angelino were aware that earlier that evening a Bell Atlantic truck had been broken into, but they did not know what, if anything, was taken. Both Sergeant Goldberg and Detective Angelino suspected that appellant was connected with the stolen Bell Atlantic equipment in a way that they did not yet know. Accordingly, it was decided not to charge appellant with any crimes. Instead, appellant was released on his own recognizance pending further investigation. Nevertheless, the police confiscated from appellant a side kick stress test,[4] a handset telephone tester, a flashlight, a roll of wire, assorted tools, the Bell Atlantic hat, and the white canvas bag.

On December 11, 1997, about five weeks after the above-described incident, Detective Angelino submitted an affidavit in support of a request for a search warrant for appellant's truck and home, located at 300 Belton Road in Silver Spring. Detective Angelino presented it to Judge Mason, who asked the detective whether the equipment appellant had on the night in question was generally available to the public. The detective advised the judge that it was not generally available.

---

4. This was described as a tool used to measure the loss of line and to tell what lines need repair.

The affidavit, which was signed and executed that day, contained a handwritten and initialed notation, added to the text of the application, which read: "This equipment is not generally available to the public for sale." [5] At that point, however, the telephone company was still unable to identify the equipment as the company's. In addition to the facts recounted above, the affidavit indicated the following information.

Detective Angelino had worked for the Montgomery County Police Department for almost twenty-five years. He averred that he had spent the last fourteen of those years assigned to the Special Investigations Division, Electronic/Technical Support Unit. In this capacity, he had been assigned to every court-ordered wire tap/interception conducted by the Montgomery County Police Department. He had also instructed the Montgomery County Police Department in methods of electronic surveillance and wire tap installation, detection, and neutralization; assisted police organizations internationally with installation, detection, and neutralization of electronic equipment problems; and kept up-to-date on current local, state, and federal laws concerning electronic equipment installation and usage.

The affidavit further stated that Linda Pabst, a Bell Atlantic security investigator, confirmed for Detective Angelino that the equipment found in appellant's canvas bag was not generally available to the public. She also informed Detective Angelino that Bell Atlantic had experienced many thefts of equipment over the previous several months, totaling hundreds of thousands of dollars. The thefts occurred almost nightly and a similar method of entry, prying off the rear window of the trucks, was used to remove the items from the Bell Atlantic trucks. Detective Angelino also related that he conducted spot surveillances of appellant's home and, on the

---

**5.** Apparently, the language was added by the court based on the detective's response to the court's inquiry. But, Detective Angelino indicated that the writing was not his, and he did not see Judge Mason initial it.

evening of December 6, 1997, appellant was observed carrying a large, dark, shiny suitcase into his home at about 1:00 a.m.

On December 9, 1997, Cathy Rhodes, a supervisor of Bell Atlantic, told Detective Angelino that some of the equipment stolen from the company's facilities was encased in a black "ABS" plastic suitcase. The affidavit also stated that appellant had a 1989 conviction for theft; a 1990 conviction for theft of property valued at more than $300 and attempted theft of property valued at more than $300; and a 1991 conviction for violation of probation.

Upon execution of the search warrant for appellant's home and truck, the police seized more than a hundred items of telephone equipment. These included butt-in sets, tone generators, tone test sets, inductive amplifiers, hand drills, crimping tools, rolls of wire, fish tape, telephone jacks, Bell Atlantic hard hats, a white canvas bag, volt meters, telephone test sets, voltage testers, T-bird meter, signal strength meters, ammeters, and assorted hand tools. The detective subsequently learned that only the hat and the sidekick units were generally unavailable for sale to the public. The butt-in set, however, was generally available.

In denying appellant's suppression motion, the court said, in pertinent part:

Insofar as the events of the night were concerned, just to recap, I mean, we have a complaint from a citizen. We have a police officer who comes on the scene. It is 10 o'clock at night.

There is a man sitting in front of, or in some fashion in front of what is known to the officer to be a telephone company piece of property which is, now I know, which is between the curb and the sidewalk, with it open.

He has got equipment in his hands and there are wires coming out of the thing, crimped wires. They should have fired the entire lot of them on the spot, the police officers, if they did not do something under those circumstances. They had to do something.

The [sic] did, in my view, the entirely appropriate thing to do. Then they saw in the automobile, which has been identified as being that of Mr. Rosenberg's nearby, a telephone company hat.

So, there was in plain view, a telephone company hat, a sidekick, a butt set—now, I am not going to try to define all of these things again. I think it has been defined somewhere. I hope I have done a good job in defining it or having it defined throughout the course of this thing—and all of which gave the appearance of being the property that one would find in the possession of an authorized telephone company employee.

We have this guy sitting out there at 10 o'clock at night doing all of whatever he was doing. I am still not clear what he was doing out there.

The officers had in my view, probable cause to believe that he was at a minimum involving himself in theft of services, possibly involved in electronic eavesdropping, theft of equipment, what was the word that you used, Mr. State, that they talked about, the statutory word?

[THE PROSECUTOR]: Molestation.

THE COURT: Molestation of property?

[THE PROSECUTOR]: Right.

\* \* \*

THE COURT: So, they had all of that. I have no problem whatsoever with the initial events. There was plenty of probable cause to believe he was violating the law, and then they went further. It is sort of a "darned if you do, darned if you don't situation."

They did a thorough job. They tried on the scene to stay on the scene and try to more sort out what was going on. Then they took it, the next step, they took him down to the precinct, and then they release him, which I think was the decent thing to do.

In no way am I going to—is anyone ever going to convince me that it was at all improper for them to do that,

nor do I think that it in anyway took away from the events that had occurred before that.

Then the warrant was prepared on the basis of information that some of which was not entirely correct, but would seem logical.

\* \* \*

All in all, the police acted in my view in an entirely properly [sic] fashion, and there is nothing wrong—no reason why I ought to disturb this search and seizure. So, the motion is denied.

We will include additional facts in our discussion.

## DISCUSSION

### I.

Appellant argues on appeal that the trial court erred in denying his motion to suppress items seized from his person, his vehicle, and his residence. He claims that the police officers lacked probable cause to arrest him and that his illegal arrest tainted the search and seizure of the canvas bag and the equipment in it. Appellant also asserts that the affidavit in support of the search warrant for his home intentionally included false information. When the false information is excised from the affidavit, appellant maintains that it lacks probable cause. Accordingly, he asserts that the evidence seized from his home and vehicle pursuant to the search warrant should have been suppressed. We shall address each argument in turn.

### A. Search and seizure on October 7, 1997

Appellant concedes that, on the night in question, the police made a lawful *Terry* stop to investigate suspicious behavior. *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He complains, however, that the *Terry* stop evolved into an unlawful warrantless search, warrantless arrest, and invalid search pursuant to a defective warrant.

The State acknowledged that the police "froze the situation" while they investigated. Nevertheless, the State insists that appellant's "detention was valid from the moment officers had probable cause to arrest...." In the State's view, the police had probable cause to arrest Rosenberg for molestation or destruction of property almost immediately. Sergeant Goldberg explained that, based on what the officers observed, "at the minimum, ... we had probable cause for destruction of property." He explained that a delay in the arrest ensued because the officers "were looking for additional charges in our digest, more specific charges relating to telephone company equipment...."

█ The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 646 n. 4, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), guarantees, *inter alia,* "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." Nevertheless, "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A warrantless search incident to an individual's lawful arrest is one of these exceptions. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Ricks v. State,* 322 Md. 183, 188–89, 586 A.2d 740 (1991). In *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court explained:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated.

In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. *Id.* at 762–63, 89 S.Ct. 2034.

In determining the legality of the search of appellant, his canvas bag, and his car on October 7, 1997, we must engage in a two-part analysis. First, we must determine when, for purposes of the Fourth Amendment, appellant was in custody. Second, we must determine whether, at the time of seizure, the police had probable cause.

" 'Custody' ordinarily contemplates that a suspect will be under arrest, frequently in a jailhouse or station house setting." *Reynolds v. State,* 88 Md.App. 197, 209, 594 A.2d 609 (1991), *aff'd,* 327 Md. 494, 610 A.2d 782 (1992), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). The concept of "custody," however, is not necessarily synonymous with an actual arrest; it also includes a reasonable perception that one is significantly deprived of freedom of action. *Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In determining whether a seizure of the person has occurred, we must decide whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court explained that the test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."

In *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the Supreme Court indicated that custody may be found when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112, 116 S.Ct. 457. Moreover, the Court of Appeals has said that the trial court must consider, *inter alia,* whether the suspect is "physically de-

prived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Whitfield v. State*, 287 Md. 124, 140, 411 A.2d 415 (1980) (internal quotation omitted). The " 'subjective intent' of a law enforcement officer, however, is not relevant in resolving the custody issue." *In re Joshua David C.*, 116 Md.App. 580, 593, 698 A.2d 1155 (1997). Examples of circumstances indicating a seizure include "the threatening presence of several police officers, the display of a weapon by an officer, some physical touching of the person . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.

In our view, appellant was seized between the time of arrival of the second group of officers and when appellant indicated that he wanted to leave the area and was told that he could not do so. It is not necessary to pinpoint the exact moment when appellant was seized, however, because we are satisfied that Officers Reilly and Power had probable cause to arrest appellant on the charge of molestation or malicious destruction of property, vandalism, or tampering with private property before the second group of officers arrived at the scene. We explain.

"The legality of the arrest and, therefore, of the reasonableness of the search and seizure incident to the arrest, turns on the law of the State in which the arrest was made, absent a controlling federal statute." *Stanley v. State*, 230 Md. 188, 191, 186 A.2d 478 (1962) (citing *United States v. Di Re*, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *Johnson v. United States*, 333 U.S. 10, 15–16, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Rabinowitz*, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L.Ed. 653 (1950)). Maryland law provides that "[a] police officer who has probable cause to believe that a felony or misdemeanor is being committed in the officer's presence . . . may arrest without a warrant any person whom the officer may reasonably believe to have committed such

offense." Md.Code Ann. (1957, 1996 Repl.Vol.), Art. 27, § 594B(b). *See Howard*, 112 Md.App. at 158, 684 A.2d 491; *Jones*, 111 Md.App. at 464, 681 A.2d 1190. In this case, Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 111(a) is pertinent. It prohibits the willful and malicious destruction, injury, defacement, or molestation of real or personal property.

Probable cause "is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." *Howard*, 112 Md.App. at 160, 684 A.2d 491 (citations omitted); *see Doering v. State*, 313 Md. 384, 403, 545 A.2d 1281 (1988). We have held that probable cause requires less than certainty but more than suspicion or possibility. *Yeagy v. State*, 63 Md.App. 1, 11, 491 A.2d 1199 (1985) (citations and quotations omitted). Moreover, it is founded on " 'the factual and practical considerations of everyday life' " on which reasonable people act, *Doering*, 313 Md. at 403, 545 A.2d 1281 (citation omitted), and is assessed by considering the totality of the circumstances in a given situation. *Collins v. State*, 322 Md. 675, 680, 589 A.2d 479 (1991).

The *Terry* stop and frisk constitutes an exception to the probable cause requirement. In *Terry v. Ohio, supra*, 392 U.S. at 21–22, 88 S.Ct. 1868, the Supreme Court held that an officer may briefly detain an individual for purposes of investigation when the officer has a "reasonable articulable suspicion" that the individual is involved in criminal activity. An "reasonable suspicion" is

> a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Moreover, in *Brown v. State*, 124 Md. App. 183, 194, 720 A.2d 1270 (1998), *cert. denied*, 353 Md. 269,

725 A.2d 1067 (1999), we recognized that "if the suspect's explanation needs to be checked out, and in particular if this explanation is known to be false in some respects, there is reason to continue the detention somewhat longer while the investigation continues."

Here, the police came across appellant at 10:00 p.m., seated in front of an open telephone box. Wires were pulled out of the box and there were wire cuttings, tools, and a canvas bag on the ground near appellant. Sticking out of the canvas bag was a brightly colored telephone receiver, which the officers recognized as a tool used by telephone repair persons when servicing telephones. Appellant told the officers that he was testing his equipment, yet he also acknowledged that he was not employed by the telephone company.

At this point, given the suspicious circumstances late at night, the police had reasonable, articulable suspicion to believe that appellant was tampering with the telephone box and might be armed. Therefore, the police were entitled to perform a *Terry* stop and frisk of appellant and the canvas bag, and to look through the window of his car for weapons. In the canvas bag the police discovered various specialized tools and several papers on which were written 1–800 and 1–900 telephone numbers. In the back seat of appellant's car, the police observed a Bell Atlantic hard hat. Surely by this point, if not sooner, we believe that the officers' reasonable articulable suspicion ripened into probable cause to arrest appellant for molestation or destruction of property.

Thus, the police had probable cause to arrest appellant prior to the arrival of the second group of officers, and before the police conducted the more thorough search of appellant's canvas bag and car, and handcuffed and arrested him. In other words, the police had probable cause to seize appellant for purposes of the Fourth Amendment before appellant was, in fact, arrested. Because the police had probable cause to arrest appellant prior to the arrival of the second group of officers, all the searches after that event were valid as

searches incident to a lawful arrest. *United States v. Robinson*, 414 U.S. at 225–26, 94 S.Ct. 467.

We add that appellant also verbally consented to the search of his car. We need not address the validity of that consent in light of our ruling.

## B. Search and seizure on December 11, 1997

Appellant complains that the affidavit in support of the search warrant "referred to and depended heavily upon the illegally obtained evidence of theft." Further, appellant argues that the affidavit contained intentional and material lies. Specifically, appellant alleges: (1) contrary to the affidavit, virtually all the items found in his canvas bag on October 7, 1997 were available for purchase by the public, and (2) contrary to the assertions in the affidavit, he did not have a 1989 theft conviction. Appellant asserts that when these falsehoods are excised from the affidavit, it lacked probable cause, and thus the search warrant was invalid. Therefore, he maintains that the court erred in not suppressing the evidence seized from his home and truck. We disagree.

 Prior to trial, an accused may file a motion to suppress based on a claim that the affidavit in support of the search warrant intentionally included false information. *See Braxton v. State*, 123 Md.App. 599, 644–45, 720 A.2d 27 (1998). In *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court set forth the applicable standard for reviewing such a challenge. Although the affidavit underlying the search warrant is presumptively legitimate, *id.*, 438 U.S. at 171, 98 S.Ct. 2674, the presumption will be overcome,

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourteenth Amendment requires that a hearing be held at the defendant's request. . . .

* * * *

To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.,* 438 U.S. at 155–56, 171, 98 S.Ct. 2674.

In order to make a "preliminary showing" under *Franks,* a defendant must establish by a preponderance of evidence that the affiant purposely misled the magistrate or acted with reckless disregard for accuracy in omitting material information from the affidavit. *Yeagy,* 63 Md.App. at 8–9, 491 A.2d 1199. Mere negligence or an innocent mistake is insufficient. *Id.* at 8, 491 A.2d 1199. *See also Connelly v. State,* 322 Md. 719, 726–27, 589 A.2d 958 (1991); John Wesley Hall, Jr., *Search and Seizure* § 26:34 (1982).

'[A] magistrate cannot adequately determine the existence of probable cause with the requisite judicial neutrality and independence if the police provide him or her with a false, misleading, or partial statement of the relevant facts … but we will not invalidate a search warrant unless the omissions were material.'

*Yeagy,* 63 Md.App. at 8, 491 A.2d 1199 (quoting *United States v. Flores,* 679 F.2d 173, 176 n. 1 (9th Cir.1982)); *see Emory v. State,* 101 Md.App. 585, 631, 647 A.2d 1243 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995). If the defendant establishes that, after excising the erroneous information, the remaining material in the warrant does not support a finding of probable cause, the search warrant will be invalidated and the evidence

obtained pursuant to the warrant will be suppressed. *Franks*, 438 U.S. at 156, 171–72, 98 S.Ct. 2674.

In this case, appellant moved to suppress the evidence seized from his home and car pursuant to the search warrant, arguing that the affidavit in support of the warrant violated *Franks*. At the suppression hearing, appellant also introduced electronic telephone catalogues into evidence to show that the tools found in his canvas bag could be purchased by the general public. In response, the State elicited testimony from Detective Angelino that, at the time he filed the affidavit in support of the search warrant, he believed that the telephone and electronic equipment found in appellant's canvas bag could not be purchased by the general public. Detective Angelino testified that he confirmed this belief with two representatives from Bell Atlantic, who also stated that the equipment was not available for purchase by the general public. Additionally, appellant acknowledged at the suppression hearing that in 1989 he had been charged in a multi-count indictment with theft, among other things. Nonetheless, he was found guilty of the other charges, but not theft.

The following testimony at the suppression hearing is relevant.

[THE PROSECUTOR]: And in the course of presenting [the application for search warrant] to Judge Mason, do you recall his asking you that very question which we have asked you now, as to whether or not this kind of equipment is generally available to the public?

[ANGELINO]: Yes, sir.

[THE PROSECUTOR]: And did you answer him?

[ANGELINO]: Yes, I did.

[THE PROSECUTOR]: And did you answer him as you have answered us today before Judge McKenna?

[ANGELINO]: Yes, sir.

[THE PROSECUTOR]: And was that because you believed honestly that this equipment, based on your experience and your conversations with phone company represen-

tatives, was not generally available for purchase by the general public?

[ANGELINO]: Was not.

[PROSECUTOR]: Okay. I have no further questions.

THE COURT: Okay. You may inquire. How about the hats? Can you buy those now? Do you now know that you can go out and buy that particular hat?

[ANGELINO]: You can't get that hat.

\* \* \*

[DEFENSE COUNSEL]: Okay. And when Judge Mason asked you that question about the availability of the equipment to the general public, you knew at that point in time that if you answered that question in the negative, that there was a chance that this warrant would not be issued, correct?

[ANGELINO]: Right.

The trial court clearly believed that Detective Angelino did not knowingly, intentionally, or with reckless disregard for the truth make any inaccurate statements concerning the public's ability to purchase telephone equipment or the 1989 theft conviction. The trial court stated:

THE COURT: Okay. I am going to sustain the objection, and the reason is that (a) even if he were to have done that, I have already made an independent decision with regard to it vis-a-vis *Franks*, that it would have stood on its own four corners even without that notation, but more importantly and (b) is the issue of the detective's credibility, and I see nothing here that—I have been trying to wrack my brain.

What would be the percentage of this detective in this case, in this setting, with this defendant risking potentially his entire career by purposefully lying to a circuit court judge on this precise issue?

I come up with a million reasons why he would not and none why he would. On the basis of that, the objection is sustained. The State's objection is sustained.

Later, the court said:

In my view, touching on the *Franks* issue, the officer—I have had an opportunity now to view Officer Angelino, view the manner in which he conducted himself on the stand.

He is a stranger to me, I believe. I do not recall him having testified before me before. I found his testimony to be quite credible.

There is nothing in the contents or lack of contents of the warrant that he placed before Judge Mason that would indicate to me that there was any purposeful mischief or— mischief of any kind, purposeful or not with regard to what he presented to Judge Mason.

Any omissions that have been pointed up by [defense counsel] were purely matters that were of no particular consequence, and did not really make that much difference in the overall scheme of things.

We perceive no error in the court's ruling. The trial court, as fact finder, was free to credit or disbelieve the testimony of witnesses. Applying the proper standard of review to the facts as found by the trial court, the court properly denied appellant's motion to suppress the fruits of the search and seizure warrant.

## II.

The trial court instructed the jury on reasonable doubt, as follows:

A reasonable doubt is a doubt founded upon reason. It is not a fanciful doubt, a whimsical doubt, or a capricious doubt. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact [t]o the extent that you would be willing to act upon such belief, without reservation, *after deliberation,* in an important matter in your own business or personal affairs.

(Emphasis added). After instructing the jury, the trial court asked the parties whether they had any comments regarding the instructions. Appellant asked the court to strike the "after deliberation" language from its instruction, but the court declined to do so.

On appeal, appellant argues that the court's insertion of the words "after deliberation" improperly deviated from the Maryland Criminal Pattern Jury Instruction on reasonable doubt, MPJI–CR 2:02. He complains that this deviation reduced the State's burden of proof, and that the offending words created reversible error. We disagree.

The Due Process Clause of the Fourteenth Amendment guarantees that a criminal defendant shall be convicted only upon proof beyond a reasonable doubt. *Wills v. State,* 329 Md. 370, 375, 620 A.2d 295 (1993) (citing *In re Winship,* 397 U.S. 358, 361–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). We are mindful that, in reviewing a jury instruction, we look to the instruction as a whole, and not to the allegedly offensive part in isolation. *Wills,* 329 Md. at 384, 620 A.2d 295. In *Merzbacher v. State,* 346 Md. 391, 399, 697 A.2d 432 (1997), the Court of Appeals made clear that although it would prefer circuit courts to use the "tried and tested" instructions contained in the MPJI–CR, there is no one definitive standard to express the concept of reasonable doubt.

Viewing the jury instructions as a whole, we note that the trial court began its jury instructions with the presumption of innocence and then moved on to explain the burden of proof. Other than the additional words, "after deliberation," the instruction mirrored the language contained in MPJI–CR. Contrary to appellant's argument, the additional words "after deliberation" in no way lessened the State's burden of proof.

We are satisfied that the trial court's reasonable doubt jury instruction, taken as a whole, adequately conveyed the concept of reasonable doubt to the jury and "impressed upon them the heavy burden borne by the State." *Merzbacher,* 346 Md. at 401, 697 A.2d 432.

## III.

Appellant presents two questions that relate to rulings by the trial court during the course of the trial. Accordingly, we shall provide a brief synopsis of the pertinent evidence presented at trial, in the light most favorable to the State.

The State elicited evidence that, from August to December 1997, telephone equipment was stolen from twenty-seven Bell Atlantic repair trucks during the late evening and early morning hours. Access to the trucks was gained by removing the back window or front vent of the vehicle. Several Bell Atlantic technicians testified for the State and identified equipment or personal items seized from appellant's home as equipment and personal items stolen from their trucks.[6] In addition, Bell Atlantic Manager Kathleen Rhodes testified that five of the side kicks seized from appellant's home matched the serial numbers of side kicks owned by Bell Atlantic. According to Rhodes, a side kick is worth about $475.00. An employee of a manufacturing company that sold butt-ins to Bell Atlantic testified that four of the butt-ins seized from appellant's home matched the serial numbers of butt-ins sold to Bell Atlantic.

Appellant refers us to the direct examination of Sergeant Goldberg. The State asked Sergeant Goldberg why he instructed another officer to seize the canvas bag on October 7, 1997. The sergeant testified that he did so because the bag and the items inside the bag resembled those a telephone repair person might use. He further testified: "[E]arlier that night I had monitored a call for a larceny from a telephone

---

6. Bell Atlantic Technician Larry Brady testified that a T-bird meter and hykemia set seized from appellant's home were stolen from his truck. He recognized the T-bird meter as his because of some remaining adhesive from a sticker on the meter. He recognized the hykemia as his because it was painted an unusual color. Bell Atlantic Technician Diana Franklin testified that a "no bounce" hammer and Hilti drill taken from her truck resembled those seized from appellant's home. She also testified that a bag seized from appellant's home was stolen from her truck. She recognized the bag because her mother had made it. Bell Atlantic Technician Richard Larrick testified that a butt-in set with a frayed cord seized from appellant's home was the one taken from his truck.

truck. At that point in time we weren't sure if it was related or not—." Appellant objected on grounds of "probable cause" and moved to strike, but the trial court overruled his objection.

Appellant argues on appeal that the trial court erred in admitting the sergeant's testimony. He asserts that he was never accused in this case of stealing anything from a telephone truck or storage location. Therefore, appellant contends that the testimony was inadmissible because: (1) it was improper "other crimes" evidence, and (2) probable cause to arrest was irrelevant to any issue before the jury.

It is well settled that a party who fails to object altogether, or who specifies one particular ground for objection, waives all grounds not articulated. *von Lusch v. State,* 279 Md. 255, 263, 368 A.2d 468 (1977). *See also Colvin–el v. State,* 332 Md. 144, 169, 630 A.2d 725 (1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994) ("Appellate review of an evidentiary ruling, when a specific objection was made, is limited to the ground assigned"); *Thomas v. State,* 301 Md. 294, 328, 483 A.2d 6 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *Tapscott v. State,* 106 Md.App. 109, 131, 664 A.2d 42 (1995), *aff'd,* 343 Md. 650, 684 A.2d 439 (1996). At trial, appellant objected to the testimony as irrelevant because it related to the issue of probable cause. Accordingly, his argument that the testimony was inadmissible "other crimes" evidence is not preserved for our review.

Even if we were to consider the merits of this claim, appellant would not prevail. Evidence of other crimes may be admitted when the evidence "has special relevance, *i.e.,* is substantially relevant to some contested issue in the case and is not offered simply to prove criminal character, and . . . has probative force that substantially outweighs its potential for unfair prejudice. . . ." *Harris v. State,* 324 Md. 490, 500, 597 A.2d 956 (1991); *see* Md. Rule 5–404. Among the permitted exceptions is evidence that tends to establish motive, intent, absence of mistake or accident, a common scheme

or plan, identity, opportunity, preparation, or knowledge. *Harris*, 324 Md. at 501 n. 3, 597 A.2d 956. Accordingly, Goldberg's testimony was relevant because it could show that Rosenberg was engaged in a common scheme to steal tools from the Bell Atlantic phone company. Moreover, the tools in the canvas bag might have been linked to tools stolen from the truck and could have provided a way to identify Rosenberg.

Nor do we believe that Rosenberg was unfairly prejudiced by this testimony. This is because Sergeant Goldberg's testimony was not especially critical to the State's case and the other evidence against Rosenberg was strong. *Cf. Braxton*, 123 Md.App. at 668–70, 720 A.2d 27 (recognizing that although disputed remarks by two police officers arguably concerned other crimes, court did not abuse its discretion in denying mistrial). Pursuant to the execution of the search warrant for Rosenberg's home, telephone equipment was recovered and taken to a Bell Atlantic facility, where Bell Atlantic employees identified some of the items as the same ones that had been stolen from them. At trial, several Bell Atlantic employees also identified items that were proprietary to Bell Atlantic, and which had been stolen from their possession.

As to appellant's second argument, that the testimony related to probable cause to arrest and thus was admitted in error, we disagree. We explain.

In *Zemo v. State*, 101 Md.App. 303, 310, 646 A.2d 1050 (1994), Judge Moylan stated for our Court that a jury "has no need to know the course of an investigation unless it has some direct bearing on guilt or innocence." When such evidence is relevant and material, however, it is ordinarily admissible. *Id.* "Evidence is relevant (and/or material) when it has a tendency to prove a proposition at issue in the case." *Johnson v. State*, 332 Md. 456, 473 n. 7, 632 A.2d 152 (1993) (citations omitted); *see* Md. Rule 5–402. A ruling on the relevance of evidence is "a matter which is quintessentially within the wide discretion of the trial judge." *Best v. State*, 79 Md.App. 241, 259, 556 A.2d 701, *cert. denied*, 317 Md. 70, 562 A.2d 718 (1989).

In this case, Sergeant Goldberg testified that he directed the officers to seize the canvas bag because it contained items that resembled those a telephone repair person might use. In addition, he testified that he knew that telephone equipment was stolen earlier that night from a telephone truck. The testimony was not elicited for the purpose of establishing probable cause to arrest appellant. Rather, the testimony was elicited to link appellant's possession of telephone equipment with the theft of telephone equipment from Bell Atlantic trucks. In fact, appellant was charged with stealing equipment, tools, and other property from Bell Atlantic. The evidence showed that the sidekick, the hard hat, and the canvas bag seized from appellant belonged to Bell Atlantic. Accordingly, we perceive no error in the court's admission of that testimony.

Even if the ruling were in error, we would find it harmless beyond a reasonable doubt. The standard of harmless error was explained in *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent view of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

Essentially, it is our task as a reviewing court to determine whether the "cumulative effect of the properly admitted evidence so outweighs the prejudicial nature of the evidence erroneously admitted that there is no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded." *Ross v. State*, 276 Md. 664, 674, 350 A.2d 680 (1976). In *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court set forth five factors that an

appellate court should use to decide the extent to which an error contributed to the verdict: the importance of the tainted evidence; whether the evidence was cumulative or unique; the presence or absence of corroborating evidence; the extent of the error; and the overall strength of the State's case.

Applying the above five factors to this case, any error is harmless. Evidence that a break-in occurred on the night that the police stopped appellant was not important in light of the fact that a Bell Atlantic manager testified that from August to December 1997, Bell Atlantic experienced twenty-seven separate break-ins of their trucks. As the "tainted" evidence was cumulative and corroborated the testimony of Bell Atlantic's representatives, the error, if any, was minimal.

### IV.

Appellant argues that the trial court improperly permitted the State to elicit from Detective Angelino his lay opinions regarding (1) the significance of crimp marks on the telephone wires in the telephone box; (2) what appellant was doing with the wires in the telephone box; (3) whether certain equipment seized from appellant's canvas bag and home belonged to Bell Atlantic; and (4) whether the blue material found on the barbed wire at a Bell Atlantic storage facility was consistent with the blue blanket found in appellant's truck. Appellant contends that the first two opinions were unfairly prejudicial because they showed that he was tampering with the telephone box to eavesdrop or to make free calls—crimes with which he was not charged. Appellant also claims that the last two opinions were unfairly prejudicial because they established a connection between him and the thefts from Bell Atlantic. We disagree.

"The rule in Maryland is that a lay witness is not qualified to express an opinion about matters which are either within the scope of common knowledge and experience of the jury or which are peculiarly within the specialized knowledge of experts." *King v. State*, 36 Md.App. 124, 135, 373 A.2d 292, *cert. denied*, 281 Md. 740 (1977); *see Goren v. United States*

*Fire Insurance Co.,* 113 Md.App. 674, 685, 688 A.2d 941 (1997). A lay witness may opine "on matters as to which he or she has first-hand knowledge," however. *Waddell v. State,* 85 Md. App. 54, 66, 582 A.2d 260 (1990); *see also Tedesco v. Tedesco,* 111 Md.App. 648, 666, 683 A.2d 1133 (1996), *cert. denied,* 344 Md. 568, 688 A.2d 446 (1997); L. McLain, MARYLAND EVIDENCE, § 602.1, at 22 (1987). But, only lay opinions that are "rationally based on the perceptions of the witness and helpful to the trier of fact" are admissible. *Wyatt v. Johnson,* 103 Md.App. 250, 268, 653 A.2d 496 (1995); *see* L. McLain, MARYLAND EVIDENCE, § 701.1, at 192. The admissibility of a lay opinion is vested in the sound discretion of the trial court. *Robinson v. State,* 348 Md. 104, 118, 702 A.2d 741 (1997); *Tedesco,* 111 Md.App. at 666, 683 A.2d 1133; *Wyatt,* 103 Md.App. at 268, 653 A.2d 496; *Waddell,* 85 Md.App. at 66, 582 A.2d 260; *Yeagy,* 63 Md.App. at 22, 491 A.2d 1199.

 The general principle governing lay opinions is embodied in Maryland Rule 5–701, which states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Thus, such testimony must derive from personal knowledge, be rationally connected to the underlying facts; helpful to the trier of fact, and not prohibited by any other rule of evidence. *Robinson,* 348 Md. at 118, 702 A.2d 741.

 The personal knowledge prerequisite requires that " '[e]ven if a witness has perceived a matter with his senses,' " he must also have " 'the experience necessary to comprehend his perceptions.' " *Robinson,* 348 Md. at 121, 702 A.2d 741 (quoting 29 Charles A. Wright & Victor J. Gold, FEDERAL PRACTICE AND PROCEDURE EVIDENCE § 6254, at 133 (1997) (footnoted omitted)). The rational connection prerequisite requires that there " 'be rational connection between th[e] perception and the opinion.' " *Robinson,* 348 Md. at 124, 702

A.2d 741 (quoting Wright & Gold, *supra*, § 6254, at 135 (footnote omitted)).

In *Robinson, supra*, the Court of Appeals described two categories into which lay opinion evidence generally falls. The first category is "lay opinion testimony where it is impossible, difficult, or inefficient to verbalize or communicate the underlying data observed by the witness." *Robinson*, 348 Md. at 119, 702 A.2d 741. The second category is where the jury "lacks the knowledge or skill to draw the proper inferences from the underlying data." *Id.* at 120, 702 A.2d 741 (quotations and citation omitted).

 As we noted, Detective Angelino worked for the Montgomery County Police Department for almost twenty-five years. He was assigned to the Special Investigations Division and worked with electronic surveillance equipment. The detective identified many of the pieces of equipment found in appellant's possession and explained how they were used. For example, he explained that a butt-in set is used to monitor existing telephone calls or to make a call. Further, he advised that a side kick test meter is used in measuring the loss of line and in telling which lines need repair. Detective Angelino also testified that during the normal course of his duties he had frequently opened and looked inside telephone boxes like the one at issue.

According to Detective Angelino, the crimp marks on the wires in the telephone box were consistent with the type of marks made by "alligator clips connected to a butt-in set." This remark was derived from the detective's first-hand knowledge, was rationally connected to the underlying facts, and was helpful to the trier of fact, because it would have been difficult, if not impossible, to convey the type of marks on the wires. Detective Angelino also testified that, based on what he had observed at the scene, he believed that appellant was using the wires hanging outside the box in an attempt either to make telephone calls or to monitor telephone lines. This remark was also based on the detective's first hand knowledge of the scene (including the tools around appellant and in the

canvas bag, the written 1–800 and 1–900 numbers on pieces of papers in the canvas bag, and the crimp marks on the wires), it was rationally connected to the underlying facts, and was helpful to the jurors because it may have been difficult for them to understand that a person could steal telephone service or make calls by opening a telephone box and attaching a number of alligator clips to certain wires.

Further, Detective Angelino testified that during a search of appellant's home he found a white canvas bag that was identical to the white canvas bag that appellant had with him when the police first saw him. Detective Angelino testified that the bag was similar to those used by the telephone company. This testimony was also derived from first-hand knowledge; was rationally connected to the underlying facts; and was helpful to the jury because there were no marks on the bags identifying them as bags used by telephone repair persons.

Lastly, appellant complains about Detective Angelino's opinion testimony that the blanket recovered from appellant's home was similar to the blue fuzzy material found on the fence at one of Bell Atlantic's facilities. Again, this testimony was based on the detective's first hand knowledge, was rationally connected to the underlying facts, and was helpful to the jury. As the material on the fence was not entered into evidence, there was no other way to communicate the similarities which Detective Angelino physically observed.

## V.

Appellant argues that the trial court erred or abused its discretion in allowing the State to introduce certain evidence at trial that had been provided to him in violation of the discovery rules.[7] We perceive neither error nor abuse of discretion. To understand this issue, we pause to present some background facts regarding discovery.

---

7. The State argues that the issue is not preserved. In view of our resolution of the issue, we need not consider that contention.

The case was originally scheduled for trial on May 20, 1998. At a hearing on May 7, 1998, appellant complained to the court that the State had not yet specified those items seized from him that it intended to use against him. The court ruled that, in fairness to appellant, it would give the State until May 12 to identify those items and, if the State did not comply within the time allowed, the court would prohibit the State from introducing any item not disclosed.

At a hearing on May 20, 1998, the original scheduled trial date, appellant objected to two documents that he had recently received from the State; one document appellant received that day, the other he had received a week earlier. Both documents listed serial numbers for certain equipment sold to Bell Atlantic. It was the State's position that the serial numbers contained in the two documents matched some of the equipment seized from appellant. Appellant conceded that he knew what equipment the State would argue he stole, but averred that the two documents represented "new information" that the State presented to him on the eve of trial. Appellant asked the court either to exclude the serial number documents from trial or to grant a postponement so he could investigate this new information. The State explained to the court that it had diligently pursued this information but, because the California company that sold the equipment to Bell Atlantic had a "relaxed" invoice system, the State had difficulty in procuring the serial number information.

After hearing arguments from both parties, the court concluded that although the State was not at fault for providing appellant the information so late in the trial process, it would be "unfair" to appellant if the case were to go to trial that day, because he had not had an opportunity to consider the information. Absent a postponement, the court said the State would be prohibited from introducing the serial number information. Later that day the case was postponed to June 15, 1998.

Before trial on June 15, 1998, appellant objected to the introduction of two pieces of evidence. Specifically, he chal-

lenged the State's introduction of the serial number information as a business record, which was offered through an employee of the manufacturing company, because the State had not provided the particular employee's name on the witness list. The company's business records showed serial numbers matching four butt-in sets found in appellant's home that were, according to the manufacturer, sold and shipped to Bell Atlantic. The court overruled this objection. Appellant also objected to a written list that the State had just presented to him, setting forth every item that the State intended to prove that he stole. Appellant conceded that he had been orally advised of the information on the list well before trial, but argued that the State should be held to the original discovery time limits that required the State to supplement the bill of particulars in writing. The court also overruled this objection. Appellant argues on appeal that the trial court should have excluded both the manufacturer's employee witness and each item the State intended to prove he stole. We disagree.

Assuming, *arguendo*, that the State violated the discovery rules, Maryland Rule 4–263(i) gives a trial court the discretion to fashion remedies for a discovery violation. The purpose of the discovery rules is to "assist the defendant in preparing his defense, and to protect him from surprise." *Hutchins v. State*, 339 Md. 466, 473, 663 A.2d 1281 (1995) (quoting *Mayson v. State*, 238 Md. 283, 287, 208 A.2d 599 (1965)). On appeal, we are limited to determining whether the trial court abused its discretion. *Aiken*, 101 Md.App. at 577, 647 A.2d 1229.

At least by May 20, 1998, appellant knew of the specific items on the list. Appellant admitted that he had been orally advised as to the items the State intended to prove he stole. He also knew the State was attempting to link some of the items recovered from him to products sold to Bell Atlantic. Appellant was not prevented from preparing his defense, nor was he surprised at any of the items listed. Accordingly, we find no abuse in the court's rulings.

260

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.